Michigan Supreme Court
Lansing, Michigan

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JUNE 8, 2010

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                                No. 138031

GEORGE EVAN FEEZEL,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

Defendant struck and killed a pedestrian when he was operating his vehicle while intoxicated. A jury convicted defendant of failing to stop at the scene of an accident that resulted in death, MCL 257.617(3), operating while intoxicated (OWI), second offense, MCL 257.625(1), and operating a motor vehicle with the presence of a schedule 1 controlled substance in his body, causing death, MCL 257.625(4) and (8). The Court of Appeals affirmed defendant's convictions. We granted leave to appeal. *People v Feezel*, 483 Mich 1001 (2009).

We hold that the trial court abused its discretion by failing to admit evidence of the victim's intoxication because it was relevant to the element of causation in MCL 257.617(3) and MCL 257.625(4) and (8). We hold that the error resulted in a miscarriage

of justice, which therefore requires reversal under MCL 769.26. In addition, defendant's conviction under MCL 257.625(4) and (8) was based on an improper interpretation of MCL 257.625(8) and must be vacated on that ground also. We overrule *People v Derror*, 475 Mich 316; 715 NW2d 822 (2006), to the extent that it is inconsistent with this opinion. Accordingly, we reverse the judgment of the Court of Appeals, vacate defendant's convictions under MCL 257.617(3) and MCL 257.625(4) and (8), and remand the case to the trial court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

Shortly before 2:00 a.m. on July 21, 2005, defendant struck and killed a pedestrian, Kevin Bass, with his car while traveling on Packard Road in Ypsilanti Township in Washtenaw County. At the time of the accident, Packard Road was an unlit, five-lane road, and it was dark outside and raining heavily. Although there was a sidewalk adjacent to Packard Road, the victim was walking down the middle of the road, with his back to oncoming traffic. The victim was extremely intoxicated, and his blood alcohol content (BAC) was at least 0.268 grams per 100 milliliters of blood. Although defendant initially left the scene of the accident after hitting the victim, he later returned while the police were investigating the incident and was arrested. Defendant's BAC at the time of the accident was an estimated 0.091 to 0.115 grams per 100 milliliters. There were also 6 nanograms of 11-carboxy-tetrahydrocannabinol (11-carboxy-THC) per milliliter in defendant's blood. Defendant was charged with several offenses, including OWI causing death; operating a motor vehicle with the presence of a schedule 1

2

controlled substance in his body, causing death; and failure to stop at the scene of an accident that resulted in death.

Before trial, the prosecutor filed a motion in limine to preclude evidence related to the victim's intoxication. The prosecutor argued that the victim's intoxication was irrelevant to whether defendant caused the accident or caused the victim's death. The trial court agreed and suppressed the evidence.

At trial, testimony revealed that defendant had been at two bars earlier that evening. At one bar, defendant was accompanied by Nicole Norman. Norman testified that she and defendant were at the bar from 11 p.m. to 1:30 a.m. At no time did she see defendant smoke marijuana, and defendant did not smell of marijuana. Norman further testified that after they left the bar, defendant drove her to Stephanie Meyers's house. After picking up Meyers, defendant dropped Norman and Meyers off at Norman's car.

Meyers testified that she was a passenger in Norman's car and Norman was driving down Packard Road moments before the accident. Meyers stated that it was pouring outside, and she did not see the victim until he was alongside the driver's side door. It was then that Meyers and Norman "snapped [their] necks backwards noticing him . . . ." Meyers also recalled that when Norman saw the victim, she stated, "That man's going to get killed." In addition, Norman testified that had she been driving in the lane that the victim was walking in, she probably would not have been able to stop her vehicle in time to avoid hitting him. Defendant was traveling down Packard Road moments after Norman's car had passed the victim.

Defendant's accident reconstruction expert found that defendant would have had

to have been driving 15 miles per hour to avoid hitting the victim. The prosecution's accident reconstruction expert agreed with defense counsel that if defendant first saw the victim from 30 feet away, then defendant would have had to have been traveling at a rate of 10 to 15 miles per hour to avoid the accident.

Defendant was convicted of failing to stop at the scene of an accident that resulted in death; OWI, second offense; and operating a motor vehicle with the presence of a schedule 1 controlled substance in his body, causing death. Defendant appealed, claiming, in relevant part, that the trial court abused its discretion by refusing to admit evidence of the victim's BAC, that the trial court erred by failing to instruct the jury on proximate cause with respect to the charges of failing to stop at the scene of an accident that resulted in death and operating a motor vehicle with a schedule 1 controlled substance, causing death, and that his conviction of operating a motor vehicle, causing death, based on the presence of 11-carboxy-THC in his body violated his due process rights under the Fifth and Fourteenth amendments of the United States Constitution.

In a divided decision, the Court of Appeals affirmed defendant's convictions. Noting that it is foreseeable for a pedestrian to be in a roadway, the majority reasoned that the trial court did not abuse its discretion by suppressing the evidence of the victim's BAC because the victim's level of "intoxication was not relevant to the critical issue in the proximate cause analysis, which is whether the victim's death was a foreseeable consequence of defendant's conduct of driving while intoxicated . . . ." *People v Feezel*, unpublished opinion per curiam of the Court of Appeals, issued November 13, 2008 (Docket No. 276959), p 12. Moreover, the majority concluded that the trial court did not

err by failing to reinstruct the jurors on proximate causation because proximate causation is not an element of MCL 257.617(3) and any error related to MCL 257.625(8) was harmless. Finally, the majority concluded that defendant's due process arguments had been rejected by this Court in *Derror.*

The partial dissent argued that the trial court's deficient instruction with respect to MCL 257.625(8) and its incorrect evidentiary ruling deprived defendant of a substantial defense and thus denied defendant his right to a fair trial. *Feezel*, unpub op at 1, 6 (SAAD, C.J., concurring in part and dissenting in part). We granted defendant's application for leave to appeal. 483 Mich 1001 (2009).

## II. ANALYSIS

### A. THE CAUSATION ELEMENT

The first issue presented in this appeal is whether the trial court abused its discretion by refusing to admit evidence of the victim's BAC. We hold that, under the facts of this case, the trial court abused its discretion by refusing to admit the evidence because it was relevant to the element of proximate causation in MCL 257.617(3) and MCL 257.625(4) and (8). Moreover, because the error resulted in a miscarriage of justice, it requires reversal under MCL 769.26.

### 1. STANDARD OF REVIEW

A trial court's decision to either admit or exclude evidence "will not be disturbed absent an abuse of . . . discretion." *People v McDaniel*, 469 Mich 409, 412; 670 NW2d

5

659 (2003). A trial court abuses its discretion when its decision falls "outside the range of principled outcomes." *People v Smith*, 482 Mich 292, 300; 754 NW2d 284 (2008).

If a reviewing court concludes that a trial court erred by excluding evidence, under MCL 769.26 the verdict cannot be reversed "unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." In examining whether a miscarriage of justice occurred, the relevant inquiry is "the 'effect the error had or reasonably may be taken to have had upon the jury's decision.'" *People v Straight*, 430 Mich 418, 427; 424 NW2d 257 (1988), quoting *Kotteakos v United States*, 328 US 750, 764; 66 S Ct 1239; 90 L Ed 1557 (1946). If the evidentiary error is a nonconstitutional, preserved error, then it "is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative." *People v Krueger,* 466 Mich 50, 54; 643 NW2d 223 (2002). An error is "outcome determinative if it undermined the reliability of the verdict"; in making this determination, this Court should "focus on the nature of the error in light of the weight and strength of the untainted evidence." *Id.* (quotation marks and citations omitted).

## 2. OVERVIEW OF CAUSATION

Three of the offenses with which defendant was charged contain an element of causation, so the prosecution was required to prove causation beyond a reasonable doubt for each offense. The Court of Appeals erred to the extent that it held otherwise. The plain language of the statutes that prohibit OWI causing death, MCL 257.625(1) and (4),

6

and the statutes that prohibit operating a motor vehicle with the presence of a schedule 1 controlled substance in one's body, causing death, MCL 257.625(4) and (8), requires that the defendant's operation of a motor vehicle have *caused* the death of another person.[1] Likewise, the plain language of MCL 257.617(3) contains an element of causation. Specifically, the statute imposes criminal liability if an individual fails to stop "following an accident *caused* by that individual and the accident results in the death of another . . . ." MCL 257.617(3) (emphasis added).[2] Thus, because the statute specifically

_____

[1] MCL 257.625 states, in relevant part:

> (1) A person, whether licensed or not, shall not operate a vehicle upon a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state if the person is operating while intoxicated. . . .

> \* \* \*

> (4) A person, whether licensed or not, who operates a motor vehicle in violation of subsection (1), (3), or (8) and by the operation of that motor vehicle *causes* the death of another person is guilty of a crime . . . .

> \* \* \*

> (8) A person, whether licensed or not, shall not operate a vehicle upon a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state if the person has in his or her body any amount of a controlled substance listed in schedule 1 under section 7212 of the public health code, 1978 PA 368, MCL 333.7212, or a rule promulgated under that section, or of a controlled substance described in section 7214(a)(*iv*) of the public health code, 1978 PA 368, MCL 333.7214. [Emphasis added.]

[2] The statute provides, in relevant part:

> (1) The driver of a vehicle who knows or who has reason to believe that he or she has been involved in an accident upon public or private

7

requires the prosecution to establish that the accident was "caused" by the accused, the

Court of Appeals ignored the plain language of the MCL 257.617(3) and erred by holding

that it does not contain a causation element. Having determined that each of the statutes

contains a causation element, we now turn to the definition of the term "cause."

In *People v Schaefer*, we stated that, in the criminal law context, the term "'cause'

has acquired a unique, technical meaning." *People v Schaefer*, 473 Mich 418, 435; 703

NW2d 774 (2005). Specifically, the term and concept have two parts: factual causation

and proximate causation. *Id.* at 435-436. Factual causation exists if a finder of fact

determines that "but for" defendant's conduct the result would not have occurred. *Id.* A

finding of factual causation alone, however, is not sufficient to hold an individual

criminally responsible. *Id.* at 436. The prosecution must also establish that the

---

property that is open to travel by the public shall immediately stop his or her vehicle at the scene of the accident and shall remain there until the requirements of [MCL 257.619] are fulfilled or immediately report the accident to the nearest or most convenient police agency or officer to fulfill the requirements of [MCL 257.619(a)] and (b) if there is a reasonable and honest belief that remaining at the scene will result in further harm. The stop shall be made without obstructing traffic more than is necessary.

\* \* \*

(3) If the individual violates subsection (1) following an accident *caused* by that individual and the accident results in the death of another individual, the individual is guilty of a felony punishable by imprisonment for not more than 15 years or a fine of not more than $10,000.00, or both. [MCL 257.617 (emphasis added).]

8

defendant's conduct was a proximate cause of, in this case, the accident or the victim's death. *Id.*[3]

Proximate causation "is a legal construct designed to prevent criminal liability from attaching when the result of the defendant's conduct is viewed as too remote or unnatural." *Id.* If the finder of fact determines that an intervening cause supersedes a defendant's conduct "such that the causal link between the defendant's conduct and the victim's injury was broken," proximate cause is lacking and criminal liability cannot be imposed. *Id.* at 436-437. Whether an intervening cause supersedes a defendant's conduct is a question of reasonable foreseeability. *Id.* at 437. Ordinary negligence is considered reasonably foreseeable, and it is thus not a superseding cause that would sever proximate causation. *Id.* at 437-438. In contrast, "gross negligence" or "intentional misconduct" on the part of a victim is considered sufficient to "break the causal chain between the defendant and the victim" because it is not reasonably foreseeable. *Id.* Gross negligence, however, is more than an enhanced version of ordinary negligence. *Id*. at 438. "It means wantonness and disregard of the consequences which may ensue . . . ." *People v Barnes*, 182 Mich 179, 198; 148 NW 400 (1914).[4] "Wantonness" is defined as

---

[3] While there are competing positions regarding the law of proximate causation, and I personally remain committed to my position regarding proximate causation presented in *Schaefer*, 473 Mich at 450-452 (CAVANAGH, J., concurring in part and dissenting in part), and *People v Tims*, 449 Mich 83, 110-125; 534 NW2d 675 (1995) (CAVANAGH, J., dissenting), this Court's decision in *Schaefer* is the current law in the state of Michigan.

[4] This case is distinguishable from *Barnes*, in which this Court defined "gross negligence" as "wantonness and disregard of the consequences which may ensue, *and*

9

"[c]onduct indicating that the actor is aware of the risks but indifferent to the results" and usually "suggests a greater degree of culpability than recklessness . . . ." Black's Law Dictionary (8th ed). Therefore, while a victim's negligence is not a defense, it is an important factor to be considered by the trier of fact in determining whether proximate cause has been proved beyond a reasonable doubt. See, e.g., *People v Campbell*, 237 Mich 424, 430-431; 212 NW 97 (1927).[5]

### 3. SUPPRESSION OF THE EVIDENCE

We must examine whether, in this case, the victim's BAC was a relevant and admissible fact for the jury's consideration when determining whether the prima facie element of proximate causation was proved beyond a reasonable doubt. We hold that it was. However, we caution that trial courts must make a threshold determination that there is a jury-submissible question of fact regarding gross negligence before such

*indifference to the rights of others that is equivalent to a criminal intent.*" *Barnes*, 182 Mich at 198 (emphasis added). In that case, the issue was whether a *defendant's* conduct amounted to gross negligence, therefore warranting a conviction for involuntary homicide. *Id.* Thus, the Court's definition of "gross negligence" provided the appropriate standard to hold a defendant criminally responsible for his or her careless acts. *Id.* The operative question here is whether the victim's conduct was grossly negligent and, therefore, cut off proximate cause and relieved defendant of criminal liability. Thus, because the conduct of the victim is at issue when determining whether there was a superseding cause, the latter portion of the Court's definition of "gross negligence" in *Barnes* is not applicable.

    [5] Whether, in a multiple vehicle accident, a victim-driver's intoxication raises a presumption of gross negligence is a question that we need not and do not reach in this case. See *People v Lardie*, 452 Mich 231, 251; 551 NW2d 656 (1996), overruled on other grounds by *Schaefer*, 473 Mich at 422.

10

evidence becomes relevant and admissible.

Under the Michigan Rules of Evidence, evidence is admissible only if it is relevant as defined by MRE 401 and is not otherwise excluded under MRE 403.[6] In *People v Crawford*, 458 Mich 376, 388; 582 NW2d 785 (1998), we explained that "[p]ursuant to MRE 401, evidence is relevant if two components are present, materiality and probative value." "Materiality is the requirement that the proffered evidence be related to 'any fact that is of consequence' to the action." *Id.*, quoting MRE 401. This Court has stated that "[b]ecause the prosecution must carry the burden of proving every element beyond a reasonable doubt, . . . the elements of the offense are always 'in issue' and, thus, material." *Crawford,* 458 Mich at 389. When examining whether the proffered evidence is probative, a court considers whether the "evidence tends 'to make

---

[6] MRE 402 provides:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court. Evidence which is not relevant is not admissible.

MRE 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

MRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence,'" and "[t]he threshold is minimal: 'any' tendency is sufficient probative force." *Id.* at 389-390 (citations omitted).

Moreover, MRE 403 excludes evidence, even if relevant, only if its probative value is "substantially outweighed" by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Thus, MRE 403 "does not prohibit prejudicial evidence; only evidence that is unfairly so." *Crawford*, 458 Mich at 398. Further, "[e]vidence is unfairly prejudicial when there exists a danger that *marginally* probative evidence will be given undue or preemptive weight by the jury." *Id.* (emphasis added).

Under these rules of evidence, a court must make a threshold determination in cases such as this of whether evidence of the victim's intoxication is relevant to the element of proximate causation. If the evidence is relevant, a court must also determine whether the evidence is nevertheless inadmissible under MRE 403. We conclude that, under the facts of this case, the evidence of the victim's BAC was relevant because it was both material and probative. In addition, its probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury because the evidence was highly probative of the element of proximate causation.

First, the materiality requirement of MRE 401 was met because, as explained earlier, the charges at issue required the prosecution to prove an element of causation beyond a reasonable doubt. See *Crawford*, 458 Mich at 389. In addition, under the broad definition of "probative," evidence of the victim's BAC must merely have *any*

12

tendency to make gross negligence on the part of the victim more or less probable. See *id.* at 389-390. Depending on the facts of a particular case, there may be instances in which a victim's intoxication is not sufficiently probative, such as when the proofs are insufficient to create a question of fact for the jury about whether the victim was conducting himself or herself in a grossly negligent manner. Generally, the mere fact that a victim was intoxicated at the time a defendant committed a crime is not sufficient to render evidence of the victim's intoxication admissible. While intoxication may explain why a person acted in a particular manner, being intoxicated, by itself, is not conduct amounting to gross negligence. In this case, however, the victim's extreme intoxication was highly probative of the issue of gross negligence, and therefore causation, because the victim's intoxication would have affected his ability to perceive the risks posed by his conduct and diminished his capacity to react to the world around him.[7] Indeed, in this case, the proffered superseding cause was the victim's presence in the middle of the road with his back to traffic at night during a rain storm with a sidewalk nearby. Thus, the proofs were sufficient to create a jury-submissible question about whether the victim was grossly negligent, and the victim's high level of intoxication would have aided the jury in determining whether the victim acted with

_____

[7] The National Highway Traffic Safety Administration has stated that at a BAC of 0.08 percent a person's "[m]uscle coordination becomes poor (e.g., balance, speech, vision, reaction time, and hearing)," it is "[h]arder to detect danger," and a person's "[j]udgment, self-control, reasoning, and memory are impaired[.]" National Highway Traffic Safety Administration, *The ABCs of BAC*: *A Guide to Understanding Blood Alcohol Concentration and Alcohol Impairment*, available at <http://www. stopimpaireddriving.org/ABCsBACWeb/images/ABCBACscr.pdf> (accessed June 2, 2010).

13

"wantonness and a disregard of the consequences which may ensue . . . ." *Barnes*, 182 Mich at 198.

Second, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The evidence was not unfairly prejudicial because, as explained earlier, the victim's high level of intoxication went to the heart of whether the victim was grossly negligent; thus, the evidence was not merely marginally probative, but instead was highly probative of the element of causation.

In addition, the probative value of the evidence was not, as the prosecution argues, substantially outweighed by the danger of confusion of the issues or misleading the jury. The prosecution's argument that the admission of evidence of the victim's BAC would "shift responsibility" from defendant ignores that under the circumstances of this case, the victim's conduct directly related to the disputed element of proximate causation and, therefore, whether the victim's actions amounted to ordinary or gross negligence. See, e.g., *May v Goulding,* 365 Mich 143, 148; 111 NW2d 862 (1961) (describing the difference between wanton misconduct and ordinary negligence as "'faults of different hues in the spectrum of human conduct'") (citation omitted). As a result, the probative value of the victim's high level of intoxication was not *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury because, under the facts of this case, the victim's BAC was highly probative of the element of proximate causation, which necessarily required the trier of fact to determine whether the victim's

14

own behavior amounted to a superseding cause.[8]

For all these reasons, we disagree with the conclusion of the Court of Appeals that the evidence was irrelevant because the "victim's intoxication, or lack thereof, does not impact the foreseeability of an intoxicated driver striking a pedestrian in the road." *Feezel,* unpub op at 11. While it is true that when a person drives intoxicated it is foreseeable that the person *may* cause an accident or *possibly* strike a pedestrian, this general premise ignores the fact that proximate causation must be decided on a case-by-case basis. See *Stoll v Laubengayer*, 174 Mich 701, 705; 140 NW 532 (1913) (stating that "[w]hile this court has never apparently attempted to accurately define the term 'proximate cause,' it has in many cases *applied the principle* as enunciated in the authorities *to the particular facts under consideration*") (emphasis added).[9] Indeed, this principle is embedded within the concept of proximate causation, which requires the trier of fact to determine whether the victim's own conduct amounted to a superseding cause. See *Schaefer*, 473 Mich at 438-439 (stating that gross negligence "by *the*

---

[8] We stress that ordinary negligence on the part of a victim is insufficient to exculpate an intoxicated driver. See *Schaefer*, 473 Mich at 437-438 (stating that "gross negligence" or "intentional misconduct" on the part of a victim is sufficient to "break the causal chain between the defendant and the victim" because it is not reasonably foreseeable).

[9] In fact, this Court has previously stated that while "[p]edestrians in a public highway have a right to assume that the driver of an automobile will use ordinary care for their protection, . . . they may not rest content on that assumption and take no care for their own safety." *Campbell*, 237 Mich at 432. Thus, "[t]he driver of an automobile has a right to assume that a pedestrian will use ordinary care for his own safety, and any assumption that he has a right to indulge in may be considered by the jury with the other facts . . . ." *Id.* at 431-432.

15

*victim . . .* will generally be considered a superseding cause") (emphasis added). Thus, to hold defendant criminally responsible, the trier of fact must find beyond a reasonable doubt that defendant's conduct was a proximate cause of *this* victim's death or of *this* accident given the particular facts of the case.

Therefore, while the victim's intoxication is not a defense, under the facts of this case it should have been a factor for the jury to consider when determining whether the prosecution proved beyond a reasonable doubt that defendant's conduct was a proximate cause of the accident, under MCL 257.617(3), or a proximate cause of the victim's death, under MCL 257.625(4) and (8).

We emphasize, however, that evidence of a victim's intoxication may not be relevant or admissible in all cases. Indeed, the primary focus in a criminal trial remains on the defendant's conduct. Accordingly, any level of intoxication on the part of a victim is not automatically relevant, and the mere consumption of alcohol by a victim does not automatically amount to a superseding cause or de facto gross negligence. Instead, under MRE 401, a trial court must determine whether the evidence tends to make the existence of gross negligence more probable or less probable than it would be without the evidence and, if relevant, whether the evidence is inadmissible under the balancing test of MRE 403.

Thus, when determining whether evidence of a victim's intoxication is admissible, the trial court must make a threshold determination that evidence of the victim's conduct is sufficiently probative for a proper purpose—to show gross negligence. In other words, the trial court must determine that the issue of gross

16

negligence is "in issue." See *People v McKinney*, 410 Mich 413, 418; 301 NW2d 824 (1981). The court may allow the admission of evidence of the victim's intoxication to aid the jury in determining whether the victim's actions were grossly negligent only when the proofs are sufficient to create a question of fact for the jury. If a trial court cannot come to the conclusion that a reasonable juror could view the victim's conduct as demonstrating a wanton disregard of the consequences that may ensue, however, then the evidence of intoxication is not admissible.

Applying these standards to the facts of this case, we hold that the trial court abused its discretion by failing to admit the evidence of the victim's BAC. In excluding the evidence, the trial court deprived the jury of its ability to consider an important, relevant factor in determining whether the victim was grossly negligent. As a result, the error undermined the reliability of the verdict. We therefore reverse the judgment of the Court of Appeals and vacate defendant's convictions of those offenses.

### 4. JURY INSTRUCTIONS

To aid the trial court on remand, we note that in this case, the jury instructions, when read as a whole, may have been confusing. In *Schaefer*, we stated that the term "cause" is "a legal term of art normally not within the common understanding of jurors . . . ." *Schaefer*, 473 Mich at 441. As a result, a jury could not be expected to understand that the term "required the prosecutor to prove *both* factual causation and proximate causation." *Id.*

The trial court instructed the jury and gave the jury a written instruction on the term's unique meaning, but the instruction was buried within the elements of the charge of OWI causing death and not included in the instructions for MCL 257.617(3) and MCL 257.625(4) and (8). Moreover, the instructions for these other charges were separated from the causation instruction by instructions on lesser included offenses and a jury verdict form. Because the potential deprivation of personal rights in criminal cases is extreme and a defendant is "entitled to have all the elements of the crime submitted to the jury in a charge which [is] neither erroneous nor misleading," *People v Pepper*, 389 Mich 317, 322; 206 NW2d 439 (1973), we caution the trial court on remand to avoid possible confusion by either reinstructing the jury on causation for each crime that contains a causation element or by referring the jurors back to its earlier causation instruction.

## B. DEFENDANT'S CONVICTION UNDER MCL 257.625(4) AND (8)

The next issue presented in this appeal is whether defendant's conviction under MCL 257.625(4) and (8) was proper.[10] In *Derror*, a majority of this Court held that 11-

[10] Although this Court is vacating defendant's conviction under MCL 257.625(4) and (8) because the trial court abused its discretion by failing to admit evidence of the victim's intoxication, this Court is not prevented from considering whether *Derror* was wrongly decided because the possibility remains that defendant will be retried under MCL 257.624(4) and (8) on remand. Thus, we disagree with the partial dissent that it is unnecessary to reach this issue. Moreover, although defendant had trace amounts of THC in his system, the amount of THC was below the threshold of the Michigan State Police's reporting protocol, and the prosecution only charged defendant with having 11-carboxy-THC in his system. The partial dissent's statement that "it is undisputed that defendant was guilty of violating this statute by virtue of the presence of actual THC" in his blood is disingenuous at best.

18

carboxy-THC, a byproduct of metabolism created when the body breaks down the psychoactive ingredient of marijuana, is a schedule 1 controlled substance under MCL 333.7212 of the Public Health Code. *Derror*, 475 Mich at 319-320. *Derror* also clarified *Schaefer* by holding that in prosecutions involving a violation of MCL 257.625(8), "the prosecution is not required to prove beyond a reasonable doubt that a defendant knew he or she might be intoxicated" because the section does not require intoxication or impairment. *Id.* at 334. Thus, because the prosecution need only establish that a defendant had any amount of a schedule 1 controlled substance in his or her body while operating a motor vehicle, under *Derror*, a person who operates a motor vehicle with the presence of any amount of 11-carboxy-THC in his or her system violates MCL 257.625(8). *Id.* at 320.

We hold that 11-carboxy-THC is not a schedule 1 controlled substance under MCL 333.7212 and, therefore, a person cannot be prosecuted under MCL 257.625(8) for operating a motor vehicle with any amount of 11-carboxy-THC in his or her system. As a result, *Derror* was wrongly decided, and because the doctrine of stare decisis supports overruling *Derror*, we overrule *Derror* to the extent that it is inconsistent with this opinion.

## 1. STANDARD OF REVIEW AND THE RULES OF STATUTORY INTERPRETATION

Questions of statutory interpretation are reviewed de novo. *Potter v McLeary*, 484 Mich 397, 410; 774 NW2d 1 (2009). The primary goal is to give effect to the intent of the Legislature. *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515;

19

573 NW2d 611 (1998). When a statute is ambiguous, judicial construction is appropriate to determine the statute's meaning. See *id.* When determining the Legislature's intent, the "'statutory language is given the reasonable construction that best accomplishes the purpose of the statute.'" *Id.* (citation omitted). Indeed, "[i]t is a well-established rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute to carry out the apparent purpose of the Legislature." *Farrington v Total Petroleum, Inc,* 442 Mich 201, 209; 501 NW2d 76 (1993). As a result, "the entire act must be read, and the interpretation to be given to a particular word in one section arrived at after due consideration of every other section so as to produce, if possible, a harmonious and consistent enactment as a whole." *Grand Rapids v Crocker,* 219 Mich 178, 182-183; 189 NW 221 (1922).

## 2. BACKGROUND: MCL 257.625(8) AND *DERROR*

MCL 257.625(8) states, in relevant part:

> A person, whether licensed or not, shall not operate a vehicle upon a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state if the person has in his or her body *any amount of a controlled substance listed in schedule 1 under section 7212 of the public health code*, 1978 PA 368, MCL 333.7212, or a rule promulgated under that section . . . . [Emphasis added.]

Under § 7212(1)(c) of the Public Health Code, marijuana is listed as a schedule 1 controlled substance. MCL 333.7212(1)(c). "Marijuana" is defined as follows:

> "Marihuana" means all parts of the plant Canabis [sic] sativa L., growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or

20

preparation of the plant or its seeds or resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks, except the resin extracted therefrom, fiber, oil or cake, or the sterilized seed of the plant which is incapable of germination. [MCL 333.7106(3).]

On the basis of these statutes, a majority of this Court concluded in *Derror* that 11-carboxy-THC is a schedule 1 controlled substance. The majority reasoned that "the Public Health Code includes within the definition of marijuana every compound and derivative of the plant . . . ." *Derror*, 475 Mich at 325. After examining several medical dictionaries with diverse definitions, the majority chose the definition of "derivative" that it believed most closely effectuated the Legislature's intent, which was "a chemical substance related structurally to another substance and theoretically derivable from it." *Id.* at 327-329 (quotation marks and citation omitted). Applying this definition of "derivative," the majority concluded that 11-carboxy-THC was included in it because the compound is structurally related to THC. *Id.* at 329. As a result, the majority concluded that MCL 257.625(8) proscribes driving with *any* amount of 11-carboxy-THC in a person's body regardless of whether the person is actually "under the influence" of marijuana while operating the motor vehicle. *Id.* at 333-334, 341. That interpretation, however, was contrary to the statutory language.

### 3. 11-CARBOXY-THC IS NOT A SCHEDULE 1 CONTROLLED SUBSTANCE BECAUSE IT IS NOT A DERIVATIVE OF MARIJUANA

*Derror* was wrongly decided. The *Derror* majority erred because it interpreted "derivative" by choosing a definition, out of several divergent definitions, that *seemed* to

include 11-carboxy-THC as a derivative when experts were in disagreement about whether 11-carboxy-THC is a derivative. *Derror*, 475 Mich at 327-328; *id.* at 350-351 (CAVANAGH, J., dissenting). More importantly, however, the majority's interpretation ignored and was inconsistent with other relevant statutory provisions. Specifically, the majority failed to interpret MCL 333.7212 in a manner consistent with federal law, ignored the factors the Legislature indicated should be used to determine whether a substance should be classified as a schedule 1 controlled substance, and ignored the Legislature's definition of "marijuana" and the Legislature's list of schedule 1 controlled substances, which do not contain the term "metabolite" or the full or any abbreviated name of 11-carboxy-THC. When MCL 333.7212 is interpreted in the context of the statutory scheme, it does not appear that the Legislature intended for 11-carboxy-THC to be classified as a schedule 1 controlled substance.

To begin with, our Legislature has declared that the provisions of the Public Health Code are "intended to be consistent with applicable federal and state law and shall be construed, when necessary, to achieve that consistency." MCL 333.1111(1). Notably, while Michigan's definition of marijuana is virtually identical to the relevant portions of the federal definition,[11] no federal court has held that 11-carboxy-THC is a controlled

---

[11] The federal statute defines "marijuana" as follows:

The term "marihuana" means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the

22

substance. Moreover, federal courts have stated that "the purpose of banning marijuana was to ban the euphoric effects produced by THC." *United States v Sanapaw*, 366 F3d 492, 495 (CA 7, 2004), citing *United States v Walton*, 168 US App DC 305, 306; 514 F2d 201 (1975) (stating that "the 'hallucinogenic' or euphoric effects produced by this agent led to the Congressional ban on possession, importation and distribution of marijuana"). An expert in this case, however, agreed that 11-carboxy-THC has no known pharmacological effect. See, also, *Derror*, 475 Mich at 321, indicating that the experts in that case agreed that 11-carboxy-THC "'itself has no pharmacological effect on the body and its level in the blood correlates poorly, if at all, to an individual's level of THC-related impairment.'" (Citation omitted.) By ignoring federal law, the majority's decision in *Derror* ignored our Legislature's proclamation that the Public Health Code is intended to be consistent with applicable federal law and "*shall* be construed . . . to achieve that consistency." MCL 333.1111(1) (emphasis added).[12]

In addition, in interpreting "derivative" by choosing a definition, out of several divergent definitions, that *seemed* to include 11-carboxy-THC, the *Derror* majority

---

seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination. [21 USC 802(16).]

[12] The partial dissent criticizes our citations of federal authority. As previously stated, however, our Legislature has expressly stated that the Public Health Code is intended to be consistent with federal law and that state law "*shall* be construed" to achieve that consistency. MCL 333.1111(1) (emphasis added). The Legislature did not state that this requirement can be ignored when a majority of this Court believes that federal courts have not properly decided the cases before them.

23

ignored other relevant statutory provisions that suggest that 11-carboxy-THC should not be considered a schedule 1 controlled substance. Our Legislature has indicated that the Michigan Board of Pharmacy must include a controlled substance in schedule 1 if "the substance has high potential for abuse" and has no accepted medical use or lacks accepted safety for use in treatment. MCL 333.7211. In addition, the Legislature has listed other factors to consider when making a determination regarding the classification of a substance:

> (a) The actual or relative potential for abuse.
>
> (b) The scientific evidence of its pharmacological effect, if known.
>
> (c) The state of current scientific knowledge regarding the substance.
>
> (d) The history and current pattern of abuse.
>
> (e) The scope, duration, and significance of abuse.
>
> (f) The risk to the public health.
>
> (g) The potential of the substance to produce psychic or physiological dependence liability.
>
> (h) Whether the substance is an immediate precursor of a substance already controlled under this article. [MCL 333.7202.]

As the *Derror* dissent indicated, "[*n*]*one* of these factors that are used to determine if a substance should be classified as a schedule 1 controlled substance applies to 11-carboxy-THC." *Derror*, 475 Mich at 349 (CAVANAGH, J., dissenting). Indeed, "11-carboxy-THC has *no* pharmacological effect on a person, and, therefore, it has no potential for abuse or potential to produce dependence." *Id.* Moreover, "it is impossible to take 11-carboxy-THC and make it into THC; therefore, it is not an immediate precursor of a substance

24

already classified as a schedule 1 controlled substance." *Id.* Thus, although MCL 333.7202 does not expressly prohibit the inclusion of particular substances in schedule 1, it would be absurd to suggest that 11-carboxy-THC, which fails to meet the criteria of MCL 333.7202, fits within that schedule. By ignoring the statutory provisions that are used to classify a controlled substance, this Court failed to carry out the purpose of the Legislature. *Farrington*, 442 Mich at 209.

In addition, 11-carboxy-THC is not a schedule 1 controlled substance under MCL 333.7212(1)(d). Under MCL 333.7212(1)(d), "synthetic equivalents" of various marijuana-related substances are included in schedule 1. "Synthetic substances are substances that were altered, sometimes in minor ways, but that can still have pharmacological effects on a person." *Derror*, 475 Mich at 352 (CAVANAGH, J., dissenting). This definition does not include 11-carboxy-THC, which is a metabolite—a natural byproduct that is created when a person's body breaks down THC. *Id.* at 321 (majority opinion). Therefore, 11-carboxy-THC is not a "synthetic" substance and, thus, not a schedule 1 controlled substance under MCL 333.7212(1)(d).

Finally, the definition of "marijuana," MCL 333.7106(3), and the Legislature's list of schedule 1 controlled substances, MCL 333.7212, do not contain the term "11-carboxy-THC" or any equivalent name. Nor do the statutes contain the term "metabolite." The Legislature, however, "knows how to use the term 'metabolite' when it wants to." *Derror*, 475 Mich at 352 (CAVANAGH, J., dissenting). In fact, MCL 722.623a requires a person to report suspected child abuse if a newborn infant has any amount of a metabolite of a controlled substance in his or her body. *Id.* "It is a well-

25

known principle that the Legislature is presumed to be aware of, and thus to have considered the effect on, all existing statutes when enacting new laws." *Walen v Dep't of Corrections*, 443 Mich 240, 248; 505 NW2d 519 (1993). The Legislature's decision to exclude the word "metabolite" from the relevant statutory provisions is further support that the Legislature did not intend that 11-carboxy-THC be classified as a schedule 1 controlled substance.

Therefore, by failing to construe the applicable portions of the Public Health Code to achieve consistency with federal law, and by failing to examine the statute in light of other relevant statutory provisions, the *Derror* majority failed to effectuate the Legislature's intent. We hold that 11-carboxy-THC is not a schedule 1 controlled substance under MCL 333.7212 and, therefore, a person cannot be prosecuted under MCL 257.625(8) for operating a motor vehicle with any amount of 11-carboxy-THC in his or her system. Although the *Derror* majority's interpretation of the statute was probably unconstitutional, because we hold that 11-carboxy-THC is not a schedule 1 controlled substance, defendant's conviction under MCL 257.625(4) and (8) cannot stand. Thus, we need not address the constitutional issues raised. [13]

---

[13] Although it is not necessary to reach the constitutional issues raised in this case, I continue to believe that the *Derror* majority's interpretation of the statute is unconstitutional. See *Derror*, 475 Mich at 354-362 (CAVANAGH, J., dissenting), stating that the majority's interpretation of the statute is unconstitutional because it failed to provide an ordinary person with notice of what conduct is prohibited, had the potential for arbitrary and discriminatory enforcement, and was not rationally related to the objective of the statute. And while the partial dissent correctly notes that I personally

26

## 4. THE DOCTRINE OF STARE DECISIS

Deciding to overrule precedent is not a decision that this Court takes lightly. Indeed, this Court should respect precedent and not overrule or modify it unless there is substantial justification for doing so. While "*stare decisis* is essential to the respect accorded to the judgments of the Court and to the stability of the law," it is "not a mechanical formula of adherence to the latest decision[.]" *Lawrence v Texas*, 539 US 558, 577; 123 S Ct 2472; 156 L Ed 2d 508 (2003) (citation and quotation marks omitted).

In *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), this Court formally established a test to determine when it is appropriate to depart from stare decisis.[14] First, this Court must consider whether the previous decision was wrongly decided. *Id.* at 464. This Court must then apply a three-part test to determine whether the doctrine of stare decisis nonetheless supports upholding the previously decided case. These include (1)

support the doctrine of legislative acquiescence, that doctrine does not enable this Court to adhere to an unconstitutional interpretation of a statute.

[14] While there are competing tests for determining whether a case should be overruled, I personally remain committed to the stare decisis factors pronounced by Chief Justice KELLY in *Petersen v Magna Corp*, 484 Mich 300, 317-320; 773 NW2d 564 (2009) (opinion by KELLY, C.J.), and, although other justices disagree with this test, I personally believe that this Court should adopt those factors. Nevertheless, *Robinson* is the law in the state of Michigan. In my personal view, however, application of the *Petersen* factors also demands that *Derror* be overruled because the presumption of upholding the precedent is rebutted by a compelling justification for overturning it—namely *Derror*'s flawed interpretation of the statute, which may have resulted in a violation of the United States and Michigan constitutions. And, as will be discussed, *Derror* defies practical workability because it encourages arbitrary and discriminatory enforcement and federal courts have not interpreted the virtually identical federal definition of "marijuana" as including 11-carboxy-THC in schedule 1. Because *Derror*'s interpretation encourages arbitrary and discriminatory enforcement, it also causes hardship and inequity to the citizens of Michigan.

whether the decision defies practical workability, (2) whether reliance interests would work an undue hardship if the decision were overturned, and (3) whether changes in the law or facts no longer justify the decision. *Id.*

As previously explained, *Derror* was wrongly decided. Applying the three-part *Robinson* test, we further conclude that the doctrine of stare decisis does not support upholding *Derror*.

The first factor weighs heavily in favor of overruling *Derror* because the decision defies practicable workability given its tremendous potential for arbitrary and discriminatory enforcement based on the "whims of police and prosecutors." *Derror*, 475 Mich at 358-359 (CAVANAGH, J., dissenting). "The United States Supreme Court has recognized that a critical aspect of the vagueness doctrine is '"the requirement that a legislature establish minimal guidelines to govern law enforcement."'" *Id.* at 359, quoting *Kolender v Lawson*, 461 US 352, 358; 103 S Ct 1855; 75 L Ed 2d 903 (1983) (citation omitted). In fact, the Court has stated that when "the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender*, 461 US at 358 (citation omitted). The *Derror* majority's interpretation of the statute, however, allows a person to be prosecuted for driving with *any* amount of 11-carboxy-THC in the person's system, even though the metabolite has no pharmacological effects. As a result, a prosecutor could "choose to charge a person found to have 0.01 nanograms of 11-carboxy-THC in his system" if the prosecutor so desires. *Derror*, 475 Mich at 359 (CAVANAGH, J., dissenting). In addition, "whether a person is deemed to

have any amount of 11-carboxy-THC in his system depends on whatever cutoff standard for detection is set by the laboratory doing the testing." *Id.* at 356. As a result, Michigan citizens cannot be sure of what conduct will be deemed criminal.[15]

Moreover, in 2008 the people of the state of Michigan legalized the use of marijuana in limited circumstances. The Michigan Medical Marihuana Act declared that "changing state law will have the practical effect of protecting from arrest the vast majority of seriously ill people who have a medical need to use marihuana." MCL 333.26422(b). Under the majority's interpretation of the statute in *Derror*, however, individuals who use marijuana for medicinal purposes will be prohibited from driving long after the person is no longer impaired. Indeed, in this case, experts testified that, on average, the metabolite could remain in a person's blood for 18 hours and in a person's urine for up to 4 weeks. See, also, *Derror*, 475 Mich at 321-322, and *id*. at 356 (CAVANAGH, J., dissenting) (stating that 11-carboxy-THC could remain in a person's blood for a long period after the THC is gone and could remain in a person's system for weeks after the marijuana was ingested). And if scientific testing develops to "detect 11-carboxy-THC from marijuana that was ingested one year ago, ten years ago, or 20 years ago, it is . . . a crime to drive . . . ." *Id.* at 358 (CAVANAGH, J., dissenting). As a result,

---

[15] In *Derror*, an expert also testified that the presence of 11-carboxy-THC in a person's blood can be the result of passive inhalation. *Derror*, 475 Mich at 357 (CAVANAGH, J., dissenting). In contrast, an expert testified in this case that, considering the studies he had read, it would be improbable for 11-carboxy-THC to be in a person's system through passive inhalation. If the *Derror* expert was correct, however, it further reinforces the fact that *Derror*'s interpretation of the statute could lead to arbitrary and discriminatory enforcement.

"long after any possible impairment from ingesting marijuana has worn off, a person still cannot drive according" to the *Derror* majority's interpretation of the statute. *Id.* at 356. Thus, under *Derror*, an individual who only has 11-carboxy-THC in his or her system is prohibited from driving and, at the whim of police and prosecutors, can be criminally responsible for choosing to do so even if the person has a minuscule amount of the substance in his or her system. Therefore, the *Derror* majority's interpretation of the statute defies practicable workability given its tremendous potential for arbitrary and discriminatory enforcement.[16]

The second *Robinson* factor also weighs heavily in favor of overruling *Derror* because *Derror* has not become "so embedded, so accepted, so fundamental, to everyone's expectations" that overruling the case would result in "significant dislocations." *Robinson*, 462 Mich at 466. To begin with, the case was recently decided. Moreover, as this Court explained in *Robinson*, a citizen normally looks to the words of the statute itself when looking for guidance on how to direct his or her actions. *Id.* at 467. 11-carboxy-THC, however, is not listed anywhere in the statute that lists schedule 1 controlled substances, MCL 333.7212. Indeed, the *Derror* majority's conclusion that 11-

---

[16] We do not, as the partial dissent suggests, imply that the legalization of marijuana for a limited medical purpose is "equated with an intent to allow its lawful consumption in conjunction with driving" or that marijuana itself should no longer be on the list of schedule 1 controlled substances. We merely note that, under the *Derror* holding, those qualified individuals who lawfully use marijuana in accordance with the Michigan Medical Marihuana Act are prohibited from driving for an undetermined length of time given the potential of 11-carboxy-THC to remain in a person's system long after the person has consumed marijuana and is no longer impaired.

carboxy-THC is a schedule 1 controlled substance required this Court to examine and choose from widely divergent dictionary definitions and ignored other statutory language that describes when a substance must be placed in schedule 1. See MCL 333.7202 and MCL 333.7211. Because this Court's interpretation of the statute confounded the legitimate expectations of citizens, it is this Court that "has disrupted the reliance interest[s]." *Robinson*, 462 Mich at 467.

Finally, although the Michigan Medical Marihuana Act represented a change in the law that lends some support to the third *Robinson* factor, overall the first two *Robinson* factors support overruling *Derror*. Because this Court cannot adhere to its previous, distorted reading of the statute under the doctrine of stare decisis, we overrule *Derror* to the extent that it is inconsistent with this opinion.

## III. CONCLUSION

We hold that the trial court abused its discretion by failing to admit the evidence of the victim's intoxication because it was relevant to the issue of causation in MCL 257.617(3) and MCL 257.625(4) and (8). Thus, under the facts of this case, the victim's BAC should have been a factor for the jury to consider when determining whether the prosecution proved beyond a reasonable doubt that defendant's conduct was a proximate cause of the accident and the victim's death. Moreover, we hold that the error resulted in a miscarriage of justice, requiring reversal under MCL 769.26. In addition, defendant's conviction under MCL 257.625(4) and (8) was based on an improper interpretation of

MCL 257.625(8) and must be vacated on that ground also.  We overrule *Derror* to the extent that it is inconsistent with this opinion.

Accordingly, we reverse the judgment of the Court of Appeals, vacate defendant's convictions under MCL 257.617(3) and MCL 257.625(4) and (8), and remand the case to the trial court for further proceedings consistent with this opinion.

KELLY, C.J., and HATHAWAY, J., concurred with CAVANAGH, J.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

No. 138031

GEORGE EVAN FEEZEL,

        Defendant-Appellant.

WEAVER, J. (*concurring*).

    I concur in and join Justice CAVANAGH's opinion, with the exceptions of footnote 14 and the citations in part II(A)(3) of *People v Crawford*, 458 Mich 376; 582 NW2d 785 (1998), a case in which I dissented.

                                      Elizabeth A. Weaver

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                 No. 138031

GEORGE EVAN FEEZEL,

      Defendant-Appellant.

_____

YOUNG, J. (*concurring in part and dissenting in part*).

A majority of justices today reach the correct conclusion that there may be circumstances in a criminal case that support introducing evidence of a victim's intoxication in order to show gross negligence. I concur in this portion of the lead opinion.

However, while I concur in the decision to grant defendant a new trial, I dissent from the gratuitous decision to overrule *People v Derror*.[1] The decision to overrule *Derror* redounds only to the benefit of a marijuana abuser who gets behind the wheel of a motor vehicle. In enacting MCL 333.7212, the Legislature made the policy decision to include marijuana "and *every* . . . derivative" of marijuana[2] in the list of schedule 1 controlled substances. The Legislature, furthermore, forbade anyone to operate a motor

_____

[1] *People v Derror*, 475 Mich 316; 715 NW2d 822 (2006).

[2] MCL 333.7106(3) (emphasis added).

vehicle with "*any* amount" of a schedule 1 controlled substance—such as a derivative of marijuana—in his or her body.[3] The decision to overrule *Derror* and rule that the metabolite 11-carboxy-tetrahydrocannabinol (11-carboxy-THC) is not a "derivative" of marijuana nullifies this clear legislative intent. In overruling *Derror*, a majority of justices usurp the role of policymaker from the people and their elected representatives and enact a policy contrary to that articulated in Michigan's controlled substances statutes. Even worse, because there is undisputed evidence that this defendant had trace amounts of *actual tetrahydrocannabinol* in his system, a majority of justices have used this case as a vehicle to overrule a decision with which they disagree even though there is plainly no reason to reach this question. This is a type of judicial overreach and activism of the worst kind.

Accordingly, I dissent from the conclusion that 11-carboxy-THC is not a derivative of marijuana within the meaning of Michigan's controlled substance laws. I likewise dissent from the decision to overrule *Derror*.

## I. MICHIGAN'S CONTROLLED SUBSTANCE LAWS

MCL 257.625(8) forbids any person to "operate a vehicle . . . if the person has in his or her body any amount of a controlled substance listed in schedule 1 under . . . MCL 333.7212 . . . ." MCL 333.7212(1)(c) lists "marihuana" as a schedule 1 controlled

---

[3] MCL 257.625(8) (emphasis added).

2

substance. The Public Health Code, within which MCL 333.7212(1)(c) appears, defines "marihuana" as

> all parts of the plant Canabis [sic] sativa L., growing or not; the seeds thereof; the resin extracted from any part of the plant; ***and every*** *compound, manufacture, salt,* ***derivative****, mixture, or preparation of the plant or its seeds or resin.*[4]

Tetrahydrocannabinol, or "THC," is the main psychoactive substance found in the cannabis plant,[5] and it is undisputed that THC is a schedule 1 controlled substance.[6] The body produces 11-carboxy-THC when it metabolizes THC. Accordingly, it is a "metabolite" of THC.[7] In *Derror*, this Court addressed whether 11-carboxy-THC, as a metabolite of THC, is also a "derivative" of THC.[8] Because "derivative" is undefined in the Public Health Code, the Court in *Derror* used medical dictionaries to define the term and thereby determine whether 11-carboxy-THC is a derivative of THC.[9]

The Court in *Derror* properly concluded that the term "derivative" encompasses metabolites. Although medical dictionaries define multiple senses of the term

---

[4] MCL 333.7106(3) (emphasis added).

[5] See *Shorter Oxford English Dictionary* (6th ed), p 3221.

[6] Additionally, the Legislature has included "synthetic equivalents" of THC in schedule 1. See MCL 333.7212(1)(d) and (e).

[7] A "metabolite" is "'[a]ny product or substrate (foodstuff, intermediate, waste product) of metabolism, especially of catabolism.'" *Derror*, 475 Mich at 326, quoting *Stedman's Online Medical Dictionary*.

[8] *Derror*, 475 Mich at 326.

[9] *Id.*, citing MCL 8.3a and *People v Schaefer*, 473 Mich 418, 435; 703 NW2d 774 (2005).

3

"derivative," the Court determined that the definition "chemical substance related structurally to another substance and theoretically derivable from it," contained in *Merriam-Webster's Online Medical Dictionary*, best effectuates the Legislature's intent.[10]  In applying this definition, the Court concluded that 11-carboxy-THC is a derivative because "it has an identical chemical structure to THC except for the eleventh carbon atom."[11]

## II.  THE DECISION TO OVERRULE *DERROR* IS A RETREAT FROM STARE DECISIS

A majority of justices today overrule *Derror* and conclude that 11-carboxy-THC is not a derivative of THC.  In doing so, they appear to retreat from their previously stated fidelity to stare decisis.[12]  The justices in the majority can say what they will about their

---

[10] *Derror*, 475 Mich at 327-329.

[11] *Id.* at 327.

[12] See, e.g., *Pohutski v City of Allen Park*, 465 Mich 675, 712; 641 NW2d 219 (2002) (KELLY, J., dissenting) ("[I]f each successive Court, believing its reading is correct and past readings wrong, rejects precedent, then the law will fluctuate from year to year, rendering our jurisprudence dangerously unstable."); *People v Hawkins*, 468 Mich 488, 517-518; 668 NW2d 602 (2003) (CAVANAGH, J., dissenting) ("'We have overruled our precedents when the intervening development of the law has "removed or weakened the conceptual underpinnings from the prior decision, or where the later law has rendered the decision irreconcilable with competing legal doctrines or policies." . . . Absent those changes or compelling evidence bearing on Congress' original intent, . . . our system demands that we adhere to our prior interpretations of statutes.'"), quoting *Neal v United States*, 516 US 284, 295; 116 S Ct 763; 133 L Ed 2d 709 (1996), quoting *Patterson v McLean Credit Union*, 491 US 164, 173; 109 S Ct 2363; 105 L Ed 2d 132 (1989); *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 278; 731 NW2d 41 (2007) (CAVANAGH, J., dissenting) ("'Under the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction become precedent and should not be lightly departed.'"), quoting *People v Jamieson*, 436 Mich 61, 79; 461

commitment to stare decisis, but the fact that they reach the issue raised in *Derror* when the facts of this case do not require this Court to address it puts to rest any semblance of principle in their positions.[13]

In deciding whether to overturn a precedent of this Court, "[t]he first question, of course, should be whether the earlier decision was wrongly decided."[14] The lead opinion has not shown that *Derror* was wrongly decided. In fact, it merely repeats similar arguments offered by the dissent in *Derror*. These arguments were unpersuasive when *Derror* was decided, and they remain unpersuasive today.

---

NW2d 884 (1990); *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 622; 702 NW2d 539 (2005) (WEAVER, J., dissenting) ("Correction for correction's sake does not make sense. The case has not been made why the Court should not adhere to the doctrine of stare decisis in this case."); Berg, *Hathaway attacks*, Michigan Lawyers Weekly, October 27, 2008 ("'People need to know what the law is,' [Supreme Court candidate Diane] Hathaway said. 'I believe in stare decisis. Something must be drastically wrong for the court to overrule.'"); *Lawyers' election guide: Judge Diane Marie Hathaway*, Michigan Lawyers Weekly, October 30, 2006 (quoting Justice HATHAWAY, then running for a position on the Court of Appeals, as saying that "[t]oo many appellate decisions are being decided by judicial activists who are overturning precedent").

[13] This case is yet another example of how the new majority is making good on Chief Justice KELLY's pledge made shortly after the shift in the Court's philosophical majority following the 2008 Supreme Court election:

> We the new majority will get the ship off the shoals and back on course, and we will undo a great deal of the damage that the Republican-dominated court has done. Not only will we not neglect our duties, we will not sleep on the bench. [*She said*, Detroit Free Press, December 10, 2008, p 2A.].

[14] *Robinson v Detroit*, 462 Mich 439, 464; 613 NW2d 307 (2000).

First, the lead opinion claims that the *Derror* Court "failed to interpret MCL 333.7212 in a manner consistent with federal law,"[15] as required under MCL 333.1111(1),[16] because "no federal court has held that 11-carboxy-THC is a controlled substance."[17] However, "no federal court has specifically *excluded* 11-carboxy-THC from the definition of 'marijuana.'"[18] Accordingly, the *Derror* Court's interpretation of MCL 333.7212 is consistent with federal law.[19]

Second, the lead opinion claims that *Derror* "ignored other relevant statutory provisions that suggest that 11-carboxy-THC should not be considered a schedule 1 controlled substance." In particular, the lead opinion claims that the Michigan Board of Pharmacy is not required to include 11-carboxy-THC in schedule 1 because the substance

---

[15] *Ante* at 22.

[16] MCL 333.1111(1) provides that the Public Health Code "is intended to be consistent with applicable federal and state law and shall be construed, when necessary, to achieve that consistency."

[17] *Ante* at 22-23.

[18] *Derror*, 475 Mich at 330 n 10.

[19] The lead opinion also claims that "federal courts have stated that 'the purpose of banning marijuana was to ban the euphoric effects produced by THC.'" *Ante* at 23, quoting *United States v Sanapaw*, 366 F3d 492, 495 (CA 7, 2004), which in turn cited *United States v Walton*, 168 US App DC 305, 306; 514 F2d 201 (1975). However, as the *Derror* Court explained, and as the dissent in *Derror* acknowledged, "the federal courts that have dealt with similar issues have reached their conclusions by interpreting the legislative history, rather than the plain language of the analogous federal statute." *Derror*, 475 Mich at 330 n 10. Our fidelity must be to the actual text of the statute, and accordingly, the *Derror* Court rightly declined to adopt federal precedents that "do not comport with the actual words that our Legislature used to convey its meaning." *Id.*

6

does not have "high potential for abuse."[20]  This argument is specious.  Although MCL 333.7211 mandates the inclusion of certain substances in schedule 1, "[i]t does not prohibit the inclusion of *other* substances in schedule 1."[21]  Moreover, the Legislature expressly listed marijuana as a schedule 1 controlled substance.  Because 11-carboxy-THC is a derivative of marijuana, it too constitutes a schedule 1 controlled substance,[22] regardless of whether it "has high potential for abuse" within the meaning of MCL 333.7211.

Finally, the lead opinion claims that, because the Legislature did not specifically *include* the terms "11-carboxy-THC" or "metabolite" in the list of schedule 1 controlled substances, it purposely *omitted* them from that list.  This argument is also specious and misses the entire point of the *Derror* decision: the Legislature expressly listed marijuana in schedule 1 and then specifically defined "marijuana" as including its derivatives.  The Legislature should not have to draft a statute in the manner of a person wearing a belt and suspenders, by expressly banning every conceivable iteration and by-product of marijuana in order to protect the citizens of Michigan from people who drive with marijuana and marijuana by-products in their systems.

---

[20] *Ante* at 24, quoting MCL 333.7211.

[21] *Derror*, 475 Mich at 330 n 9 (emphasis added).

[22] *Id.*

7

Because *Derror* was correctly decided, the decision whether to overrule *Derror* should end there. However, even if *Derror* had been wrongly decided, other relevant factors exist that caution against overruling *Derror*.

Before overruling a wrongly decided precedent, this Court must consider "whether the decision at issue defies 'practical workability,' whether reliance interests would work an undue hardship, and whether changes in the law or facts no longer justify the questioned decision."[23] None of these factors compel overruling *Derror*.

*Derror* does not defy practical workability merely because of the "*potential* for arbitrary and discriminatory enforcement . . . ."[24] Moreover, the voters' approval of the Michigan Medical Marihuana Act[25] is not, as the lead opinion suggests, relevant to deciding whether to overrule *Derror*.[26] To begin with, legalization of the use of marijuana for a limited medical purpose cannot be equated with an intent to allow its lawful consumption in conjunction with driving. The lead opinion's argument, taken to its logical extreme, suggests that *marijuana itself*, not just its derivative, 11-carboxy-THC, should no longer be a schedule 1 controlled substance because of its limited legalization by the Michigan Medical Marihuana Act. It is clear that the act operates *in*

---

[23] *Robinson*, 462 Mich at 464.

[24] *Ante* at 28 (emphasis added).

[25] MCL 333.26421 *et seq*.

[26] Of note, defendant's conduct occurred in 2005, three years before the people of Michigan approved the Michigan Medical Marihuana Act.

*harmony with* existing controlled substances laws, not *in place of* them.[27]  In particular, the act only provides that a "*qualifying* patient who has been issued and possess a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner . . . for the medical use of marihuana in accordance with this act . . . ."[28]  Notably, the act also prohibits the operation of a motor vehicle "while under the influence of marihuana."[29]

> Finally, the lead opinion expresses concern that *Derror* impermissibly prohibits
>
> those qualified individuals who lawfully use marijuana in accordance with the Michigan Medical Marihuana Act . . . from driving for an undetermined length of time given the potential of 11-carboxy-THC to remain in a person's system long after the person has consumed marijuana and is no longer impaired."[30]

This concern is a red herring.  The act itself provides: "All other acts and parts of acts inconsistent with this act do not apply *to the medical use of marihuana as provided for by this act*."[31]  Therefore, to the extent the act's prohibition of driving "under the influence" of prescribed medical marijuana may be narrower than the statutes at issue in this case and the application of *Derror*, the people of Michigan have determined that the act supersedes Michigan's controlled substances laws.  Nevertheless, it does so *only* vis-à-vis prescribed medical marijuana, not in other circumstances, such as those in the case at bar.

---

[27] After all, *alcohol* is a legal substance, and no one would suggest that the Legislature could not restrict from driving those who consume alcohol.

[28] MCL 333.26424(a).

[29] MCL 333.26427(b)(4).

[30] *Ante* at 30 n 16.

[31] MCL 333.26427(e) (emphasis added).

9

The lead opinion's denigration of the reliance interests involved in applying *Derror* is similarly misguided. Some justices in the majority attach significance to the doctrine of "legislative silence" or "acquiescence."[32] But here, the lead opinion's position appears to be inconsistent with this professed adherence to the doctrine that "[i]f a legislature reenacts a statute without modifying a high court's practical construction of that statute, that construction is implicitly adopted."[33] It is noteworthy that the Legislature has reenacted MCL 257.625 *four times* by amending it since this Court decided *Derror*.[34] At none of those times did the Legislature amend the provision that forbids a person to operate a motor vehicle with "any amount of a controlled substance listed in schedule 1 under . . . MCL 333.7212 . . . ."[35] Furthermore, the Legislature has not amended the list of schedule 1 controlled substances since *Derror* to exclude

---

[32] "Silence by the Legislature following judicial construction of a statute suggests consent to that construction." *Donajkowski v Alpena Power Co*, 460 Mich 243, 270; 596 NW2d 574 (1999) (KELLY, J., joined by CAVANAGH, J., dissenting). I believe that this is a shallow, incoherent doctrine, as I stated in my *Donajkowski* majority opinion. See *id.* at 259-262. However, it is a doctrine upon which some justices in the majority rely when it is convenient to do so.

[33] *Hawkins*, 468 Mich at 519 (CAVANAGH, J., joined by KELLY, J., dissenting), citing 2B Singer, Statutes & Statutory Construction (2000 rev), § 49.09, pp 103-112.

I continue to adhere to my stated position that "[i]n the absence of a clear indication that the Legislature intended to either adopt or repudiate this Court's prior construction, there is no reason to subordinate our primary principle of construction—to ascertain the Legislature's intent by first examining the statute's language—to the reenactment rule." *Hawkins*, 468 Mich at 508-509 (majority opinion).

[34] See 2006 PA 564; 2008 PA 341; 2008 PA 462; 2008 PA 463.

[35] MCL 257.625(8).

10

metabolites of marijuana or 11-carboxy-THC. Thus, for those in the majority who subscribe to the doctrine of legislative acquiescence, the Legislature's multiple reenactments and acquiescence have significance and, accordingly, embarrassingly belie the majority's argument that no reliance interests are involved in overturning *Derror*.

## III. AS THERE WAS ACTUAL THC IN DEFENDANT'S BLOOD, THERE IS NO NEED TO REACH THE QUESTION WHETHER DERIVATIVES ARE WITHIN THE AMBIT OF THE STATUTE

Finally, and perhaps most important, the decision to overrule *Derror* is simple unnecessary in the instant case. Not only did defendant's blood contain the derivative 11-carboxy-THC, it *also contained THC itself.* All members of this Court, including those in the majority, agree that having "any amount" of THC in a driver's bloodstream, however slight, is illegal under this statute. Therefore, in a case in which it is undisputed that defendant violated this statute by virtue of the presence of actual THC, it is unnecessary to review whether 11-carboxy-THC is a schedule 1 controlled substance. Consequently, the decision by a majority of justices to overrule *Derror* should be seen for what it is: an unnecessary and exceedingly aggressive act to kill a case with which the new majority of this Court disagrees.

## IV. CONCLUSION.

In enacting MCL 333.7212, the Legislature made the policy decision to include marijuana "and *every* . . . derivative" of marijuana[36] in the list of schedule 1 controlled

---

[36] MCL 333.7106(3) (emphasis added).

11

substances. The Legislature, furthermore, forbade anyone to operate a vehicle with "*any amount*" of a schedule 1 controlled substance—such as a derivative of marijuana—in his or her body.[37] This Court's decision in *Derror* correctly determined that the metabolite 11-carboxy-THC is a "derivative" of the marijuana. The determination by the majority of justices to overrule *Derror* is not only ill considered, but also usurps the clear policy choices of the people of Michigan. It is undisputed that there was *actual THC* in defendant's bloodstream. Therefore, whether derivatives of THC are also prohibited is not a question that is necessary for this Court to reach *in this case*. This decision is thus indicative of the new majority's willfulness to overrule cases with which it disagrees. Accordingly, I vigorously dissent from the decision to overrule *Derror*.

CORRIGAN and MARKMAN, JJ., concurred with YOUNG, J.

---

[37] MCL 257.625(8) (emphasis added).

12