# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 28, 2018

Plaintiff-Appellee,

v

No. 330759
Wayne Circuit Court
LC No. 12-003749-01-FH

THABO MANGEDWA JONES,

Defendant-Appellant.

ON REMAND

Before: SERVITTO, P.J., and JANSEN and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of reckless driving causing death, MCL 257.626(4). The trial court sentenced defendant to 3 to 15 years' imprisonment for the conviction.

On October 31, 2017, this panel reversed the judgment of sentence, vacated defendant's conviction, and remanded the case to the trial court for further proceedings. *People v Jones*, unpublished per curiam opinion of the Court of Appeals, issued October 31, 2017 (Docket No. 330759) (*Jones I*). This panel concluded that the trial court erred in excluding evidence of the victim's blood alcohol content (BAC) at the time of the accident, and this panel determined that it appeared more likely than not that this error was outcome determinative. *Id*. at 1-4. On April 20, 2018, our Supreme Court vacated the part of this Court's opinion holding that the exclusion of the disputed evidence was not harmless error and remanded the case to this Court for reconsideration of that issue. *People v Jones*, 501 Mich 1054; 909 NW2d 448 (2018) (*Jones II*). The Supreme Court stated that this Court had erroneously equated the effect of the error on defendant's trial strategy with an assessment of whether it was more probable than not that a different outcome would have resulted if the evidence had been admitted. *Id*. at 1054. The Supreme Court explained that, while the defense strategy is one pertinent consideration, "on remand the Court of Appeals must consider it alongside the weight and strength of the untainted evidence and the proofs as a whole." *Id*. at 1055. We now affirm.

-1-

The underlying facts of this case are summarized in this panel's prior opinion:

> This appeal arises from a fatal motor vehicle accident involving defendant and the decedent, John Ortiz, on March 2, 2012, near the intersection of I-94 and Livernois Road in Detroit, Michigan. Witnesses observed defendant driving erratically and at excessive speeds immediately before the accident. Defendant's vehicle slammed into the rear end of Ortiz's vehicle hard enough to send it careening across multiple lanes of traffic, causing Ortiz's almost instant death. At trial, defendant claimed that the accident occurred when Ortiz pulled suddenly into defendant's lane and defendant lost control of his vehicle. His defense theory was that Ortiz's action constituted a superseding cause of the accident, breaking the causal connection between defendant's conduct and Ortiz's death and relieving defendant of criminal liability. In support of his theory, defendant sought to admit evidence that Ortiz's blood alcohol content [BAC] measured 0.201 at the time of the accident, and evidence of Ortiz's two prior DUI convictions. The trial court denied defendant's request to admit the proposed evidence. Defendant was subsequently convicted. [*Jones I*, unpub op at 1.]

We review preserved, nonconstitutional errors for harmless error as set forth in MCL 769.26:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

A defendant bears the burden of showing that "it is more probable than not that the error was outcome determinative." *People v Lyles*, 501 Mich 107, 117–18; 905 NW2d 199 (2017), quoting *People v Lukity*, 460 Mich 484, 495–496; 596 NW2d 607 (1999).

The Reckless-Driving-Causing-Death statute specifically contains an element of causation, stating that "a person who operates a vehicle in violation of subsection (2) and by the operation of that vehicle *causes* the death of another person is guilty of a felony . . . ." MCL 257.626(4) (emphasis added). In the context of criminal law, the causation element of an offense has two required components that must be established by the prosecution beyond a reasonable doubt: factual cause and proximate cause. *People v Schaefer*, 473 Mich 418, 435; 703 NW2d 774 (2005); *People v Feezel*, 486 Mich 184, 193; 783 NW2d 67 (2010). Factual cause exists when "but for" the defendant's conduct, the result would not have occurred. *Schaefer*, 473 Mich at 435-436. As noted in our prior opinion, defendant conceded the issue of factual causation. *Jones I*, unpub op at 2.

With respect to proximate causation, our Supreme Court has explained:

For a defendant's conduct to be regarded as a proximate cause, the victim's injury must be a "direct and natural result" of the defendant's actions. In making this determination, it is necessary to examine whether there was an intervening cause that superseded the defendant's conduct such that the causal link between the defendant's conduct and the victim's injury was broken. If an intervening cause did indeed *supersede* the defendant's act as a legally significant causal factor, then the defendant's conduct will not be deemed a proximate cause of the victim's injury. [*Schaefer*, 473 Mich at 436–37] (emphasis in original)

Whether an intervening cause supersedes a defendant's conduct is a question of reasonable foreseeability; ordinary negligence is reasonably foreseeable and thus not a superseding cause whereas a victim's gross negligence or intentional misconduct is not reasonably foreseeable and is thus sufficient to break the causal chain between the defendant and the victim. *Feezel*, 486 Mich at 195. Gross negligence means "wantonness and disregard of the consequences which may ensue." *Id*. (quotation omitted). "Wantonness," in turn, is defined as "[c]onduct indicating that the actor is aware of the risks but indifferent to the results" and usually "suggests a greater degree of culpability than recklessness . . . ." *Id*. at 195-196, quoting Black's Law Dictionary (8th ed.).

Taking into account not just the defense strategy, but the weight and strength of the untainted evidence and the proofs as a whole, we are satisfied defendant has failed to demonstrate it is more likely than not that the error in excluding the evidence of the victim's BAC was outcome determinative. Initially, it must be emphasized that defendant was not denied the opportunity to present evidence concerning his theory of how the accident occurred. That is, defendant testified in his own defense concerning how he claims the accident happened. Defendant testified about a purported problem with his brakes and with excessive acceleration on his rental vehicle that, according to defendant, led to the excessive speed at which he was travelling. Defendant also testified about his claim that the accident occurred when the victim pulled into defendant's lane, which, according to defendant, was the left lane of the three southbound lanes on Livernois, in front of defendant. In addition, the parties stipulated that the victim's license had been suspended in 2008 for a traffic violation and a speeding violation and that his license remained suspended until the payment of reinstatement fees. It is certainly true that the admission of evidence of the victim's BAC could have *aided* defendant's theory that the victim caused the accident. It is not more probable than not, however, that defendant's strategy was likely to succeed when considered relative to the proofs as a whole.

First, the victim's alleged pulling into defendant's lane could have had nothing to do with his BAC. The two are not *necessarily* related. Rather, persons pulling out in front of others or changing into lanes in front of others on a several lane thoroughfare are not uncommon, and would generally represent a type of ordinary negligence that is reasonably foreseeable, and thus not a superseding cause. *Feezel*, 486 Mich at 195.

Second, defendant's version of events was seriously called into question and challenged in numerous respects. For example, defendant admitted that he had driven the rental vehicle from Royal Oak, and yet he claimed that the purported problems he had experienced with the brakes and the accelerator did not arise until he reached Livernois (the street where the accident occurred), which was about 20 miles from where he began driving. Defendant also

acknowledged that his written statement made to the police, after the accident, did not refer to any problems with the brakes or the accelerator. Defendant testified that the police officer who wrote out defendant's statement failed to include these matters in the written statement but defendant admitted that he was afforded an opportunity to make corrections to the written statement and that he did not do so. Defendant also testified that he thought that the victim's car had only "clipped" defendant's vehicle and that defendant did not realize his vehicle actually hit the back of the victim's car until defendant heard the forensic evidence at trial. Defendant provided no explanation of how he could have perceived the accident as a mere "clipping" given the testimony regarding the damage to the vehicles and the fatal injury.

Third, and most importantly, defendant's testimony about how the accident occurred is completely contradicted by the testimony of neutral witnesses and by physical evidence. The overwhelming weight of the evidence strongly supports the prosecutor's theory that, contrary to defendant's testimony, it was defendant who pulled into the victim's lane while driving recklessly.

Paul Vela, a Detroit firefighter, was an eyewitness to the accident. Vela testified that shortly before the accident he was traveling in the right lane of the three southbound lanes on Livernois at approximately 35 miles per hour which was the posted speed limit. Vela testified that the victim's vehicle was in the middle lane of the southbound lanes, a short distance ahead of Vela's vehicle, and that the victim was traveling about the same speed as Vela or perhaps slightly slower than Vela, because Vela was coming up on the victim's vehicle. Vela testified that he did not see the victim driving erratically at any point and everything seemed normal. Then, in his rearview mirror, Vela saw defendant's vehicle approaching from behind in Vela's lane at a "very, very fast[]" rate of speed. Vela estimated that defendant was traveling 80 to 100 mph. Vela testified that he started to veer over to the right parking lane in order to avoid being hit by defendant's approaching vehicle. At the same time, defendant's vehicle moved into the middle lane to pass Vela's vehicle. According to Vela, defendant's vehicle then struck the back of the victim's vehicle in the middle lane. Vela testified that he viewed the accident from approximately 10 feet away and there was nothing blocking his vision. In short, Vela testified that the victim's car never changed lanes from the time Vela saw it until the accident occurred and that it was in fact defendant's vehicle that changed lanes before it hit the victim's vehicle.

Testimony from two other neutral witnesses confirmed the excessive speed at which defendant's vehicle was traveling before the accident occurred. Daniel Kolarich testified that, while he did not see or hear the actual accident, defendant's vehicle "flew past" Kolarich on Livernois and defendant's vehicle was traveling so fast that it appeared to be "floating." Kolarich testified that he saw defendant's vehicle "whipping in and out of traffic" and "maneuvering through the cars," even at one point dodging around two cars and cutting in front of a school bus resulting in the school bus driver having to apply the brakes. Kolarich estimated that defendant was traveling between 55 and 70 mph when Kolarich saw defendant's vehicle and Kolarich testified that defendant's vehicle seemed to be accelerating as it drove away.

Keisha Aldridge, who also did not witness the accident, testified that she was traveling in the middle lane of the southbound lanes of Livernois when defendant's vehicle came from behind her, switched to the left lane, and passed her vehicle. Aldridge testified that she was traveling at a speed of around 35 to 38 mph while defendant's vehicle was traveling at an

-4-

estimated minimum of 70 mph. According to Aldridge, the momentum of defendant's vehicle shook her vehicle when defendant passed her. After defendant passed Aldridge, she saw defendant's vehicle begin moving over to the right from the left lane. Aldridge later heard a collision, then came upon the accident site and saw smoke and debris.

Detroit Police Sergeant Paul Warner testified that the debris field at the accident scene was located in the middle lane of the three southbound lanes of Livernois. Based on the damage to the vehicles, Warner explained that it appeared that the passenger side of the front of defendant's vehicle struck the driver's side of the rear of the victim's vehicle. Warner testified that, based on his review of the crash site as well as testimony that the victim's vehicle was traveling at 30 to 35 mph, defendant's vehicle was traveling at an excessive rate of speed at the point of impact, although Warner could not provide an exact number. Michigan State Police Sergeant Kevin Lucidi, an expert in accident reconstruction, similarly testified that, on the basis of his review of photographs of the damaged vehicles, approximately one-half of the front of defendant's vehicle was in contact with about one-half of the back of the victim's vehicle and that this was not a mere clipping of the vehicles. Lucidi also concluded that defendant's vehicle struck the victim's vehicle and that defendant's vehicle was traveling considerably faster than the victim's vehicle was traveling.

Finally, Dr. Lokmon Sung, the assistant medical examiner who performed the autopsy of the victim's body, testified that there was a separation or transection of the base of the victim's skull from the cervical spine, meaning essentially that the skull was separated from the neck. Dr. Sung testified that such an injury requires the application of a force sufficient to break the bones, ligaments, and tendons holding the neck to the base of the skull and that a person suffering such an injury would die within moments. Dr. Sung further testified that this injury would "require high velocity or a large or great amount of speed for the collision." According to Dr. Sung, the injury was consistent with the victim's vehicle being struck by another car from the rear at a very high rate of speed.

Aside from defendant's self-serving testimony, there is no evidence that the victim drove into the left lane in front of defendant. And, given that defendant's uncorroborated testimony was strongly contradicted by the overwhelming evidence presented by the prosecutor, we are not convinced that the admission of evidence concerning the victim's BAC would likely have made a difference at trial.

In *Lyles*, 501 Mich at 112, our Supreme Court held that the defendant had failed to show that it was more likely than not that the trial court's erroneous denial of the defendant's request for an instruction regarding evidence of his good character was outcome determinative. Our Supreme Court noted that the

> [d]efendant was permitted to introduce his good-character evidence; it was, however, minimal and strongly contradicted by the prosecution's witnesses. Given this and the other evidence implicating defendant in the murder, we cannot conclude that the absence of the instruction, the only error alleged here, made the difference. [*Id.*]

Our Supreme Court in *Lyles* further explained the focus in determining whether the error was harmless should not be on the importance of the instruction to the defendant's defense strategy but on the likelihood of the defendant actually prevailing on that strategy:

> When considering whether the error was harmless, the question is whether the instruction *would have made a difference in the outcome.* See *Lukity,* 460 Mich at 495-496. Answering this question requires a court to consider not only the relationship between the instruction and defendant's defense strategy, but also the strength of that strategy relative to the proofs as a whole. Defendant's character evidence was extremely weak. But he was not denied the opportunity to present it; he was only denied a proper instruction that the jury could consider this evidence with all the other evidence in the case and that good-character evidence, if believed by the jury, could alone produce a reasonable doubt. Even if the jury had been properly instructed, it is not more likely than not that defendant's character evidence would have been sufficient to create a reasonable doubt, given the prosecution's evidence; and so defendant failed to show that the instructional error was harmful. [*Lyles*, 501 Mich at 118.]

Essentially, where the properly admitted evidence of a defendant's guilt was so overwhelming, an evidentiary error is considered harmless. See, e.g., *People v Rosa*, 322 Mich App 726; 913 NW2d 392 (2018).

Defendant was allowed to present his ultimate defense theory—that the victim drove into defendant's lane in front of him. In light of the evidence, however, the proofs as a whole overwhelmingly demonstrate that defendant recklessly drove into the victim's lane at a high rate of speed and caused the accident. Even if defendant was allowed to introduce evidence of the victim's BAC at trial, it is unlikely that such evidence would have affected the jury verdict. Just as in *Lyles*, the strength of this strategy was weak relative to the proofs as a whole and, given the tremendous amount of evidence of defendant's guilt and the lack of evidence of any act on the victim's part as a superseding cause, it is not more likely than not that evidence of the victim's BAC would have been outcome determinative.

Affirmed.

/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens