*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KENNETH ANTHONY WALKER,

        Defendant-Appellant.

UNPUBLISHED
September 10, 2020

No. 346737
Wayne Circuit Court
LC No. 18-005372-01-FC

Before: JANSEN, P.J., and K.F. KELLY and CAMERON, JJ.

PER CURIAM.

Defendant, Kenneth Anthony Walker, appeals as of right his jury trial convictions of assault with intent to commit murder, MCL 750.83, armed robbery, MCL 750.529, carrying a concealed weapon, MCL 750.227, carrying a weapon with unlawful intent, MCL 750.226, felon in possession of a firearm ("felon-in-possession"), MCL 750.224f, and four counts of possession of a firearm during the commission of a felony ("felony-firearm"), second offense, MCL 750.227b(1). Walker was sentenced, as a third-offense habitual offender, MCL 769.11, to 35 to 60 years' imprisonment for the assault with intent to commit murder conviction, 35 to 60 years' imprisonment for the armed robbery conviction, one to five years' imprisonment for the carrying a concealed weapon conviction, one to five years' imprisonment for the carrying a weapon with unlawful intent conviction, one to five years' imprisonment for the felon-in-possession conviction, and five years' imprisonment for each of the felony-firearm, second offense, convictions. We affirm.

## I. BACKGROUND

This matter arises from the June 12, 2018 shooting and robbery of the victim while he was seated in his car on Basil Street in Detroit, Michigan. Before the crimes occurred, a person that the victim did not know called him and offered to sell him five cell phones in exchange for $2,200. The caller gave the victim an address on Basil Street, and the victim proceeded to that location. Once the victim arrived at the address, he saw two men that he did not know standing outside. One of the men, whom the victim identified at trial as Walker, approached the victim, confirmed that he had the cell phones, and got into the back passenger seat of the victim's vehicle. When the

victim turned around, he saw that Walker had a gun pointed at the victim's chest. After Walker shot the victim in the chest and the shoulder, he demanded money. The victim gave Walker $2,200. Thereafter, Walker got out of the vehicle and fled with his accomplice.

The victim was later transported to the hospital and law enforcement was contacted. The victim gave members of law enforcement his cell phone so that they could read the text messages that were exchanged between him and Walker. The police searched a departmental database and associated the number on the victim's phone with Walker. When the victim was shown a photographic lineup, he identified Walker as the shooter with "100%" certainty. Walker was arrested and charged with assault with intent to commit murder, armed robbery, carrying a concealed weapon, carrying a weapon with unlawful intent, felon-in-possession, and four counts of felony-firearm, second offense.

At a September 11, 2018 pretrial hearing, the prosecutor placed a plea offer on the record. In exchange for Walker pleading guilty to assault with intent to murder, armed robbery, and one count of felony-firearm, second offense, the remaining charges would be dismissed and the habitual offender notice would be withdrawn. The prosecutor also agreed to a sentencing agreement of 15 to 30 years' imprisonment, which would be served consecutive to the five years of mandatory imprisonment for the felony-firearm conviction. It was agreed that the offer would remain open until September 25, 2018. At a September 25, 2018 pretrial hearing, the prosecutor noted that defense counsel had asked if she "could do anything a little better." The prosecutor indicated that she had spoken with her supervisor and that Walker was offered a decreased sentencing agreement of 14 to 30 years' imprisonment, in addition to the mandatory five years' imprisonment for the felony-firearm conviction. Defense counsel stated on the record that Walker rejected the offer and wanted to proceed to trial. Walker confirmed this on the record. During an October 10, 2018 pretrial hearing, the prosecutor's second offer was reiterated on the record, and it was noted that the offer would remain open until October 12, 2018. During an October 12, 2018 pretrial hearing, the trial court restated the offer on the record and confirmed that Walker understood the offer. When asked by the trial court if he wished to accept the offer, Walker stated that he wanted to reject the offer and "[g]o to trial."

At trial, the victim identified Walker as the man who had shot and robbed him. Testimony was presented that the cell phone number that the victim had communicated with before the crimes were committed was associated with Walker. Officer James McDonald testified regarding analyses he performed on call records for Walker's cellular account. The prosecution did not introduce Officer McDonald as an expert. However, Officer McDonald testified that, around the time of the shooting, Walker's cell phone was communicating with a cellular tower that "definitely will pick up somebody that's on Basil using their cellular device." Although the tower was not within the range of Basil Street, Officer McDonald testified that the range of that tower extended beyond the range depicted on a map that he had generated using a program called Penlink. The trial court interrupted Officer McDonald's testimony, and his qualifications to provide expert testimony were examined outside the presence of the jury. The trial court ultimately ruled that Officer McDonald was not a qualified expert in cellular analysis and that cross-examination would be sufficient to cure any prejudice to Walker.

Walker was convicted of all of the charged crimes. The trial court sentenced Walker to terms of imprisonment, and this appeal followed.

## II. ANALYSIS

## A.  CELLULAR ANALYSIS

Walker argues that the trial court erred in allowing Officer McDonald to testify about the operation of cellular towers in general and to testify that Walker's cell phone was likely near Basil Street even though the cell phone was outside of the range created by the Penlink program.  We disagree.

"We review for an abuse of discretion the trial court's evidentiary rulings that have been properly preserved."  *People v Fomby*, 300 Mich App 46, 48; 831 NW2d 887 (2013).  "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes."  *Id*. (quotation marks and citation omitted).[1]

At trial, Officer McDonald testified that he obtained and analyzed call records for the cell phone number associated with Walker.  He testified that, at 10:19 a.m. on June 12, 2018, the number associated with Walker made an outgoing call to the victim's number, and that the number made another outgoing call to the victim at 3:13 p.m.  The number associated with Walker received a call from the victim at 3:41 p.m.  The prosecutor showed Officer McDonald a map that depicted the cellular towers in the area of the crime scene and the "sectors," or coverage areas, of each one.  Officer McDonald explained that he uploaded the call record data into a program called Penlink, which created the map.  The prosecutor moved to admit the map, and defense counsel responded, "No objection."  The map was admitted into evidence.

Thereafter, Officer McDonald explained that Basil Street was highlighted on the map.  Officer McDonald further explained that the records did not provide the exact location from which a call was made; rather, it would provide "a sector."  Officer McDonald explained that each sector was represented by a "pie" shape:

> And this pie is created just so (INAUDIBLE) understand the sector.  It doesn't mean that—[t]he radio frequency stops here.  So, our phones communicate through radio frequency, just like your AM/FM radio will do.  The phone sends out signals, the tower picks it up . . . .  So Mr. Walker's phone is communicating with this . . . tower.  And this tower covers this sector.  The radio frequencies, they continue to travel.  They just don't st[o]p within their sector.  So, you see that even though the [crime] scene is outside this pie, that doesn't mean that the radio

---

[1] The issue does not conform to our traditional preservation requirements for appellate review because defense counsel failed to raise a contemporaneous objection to the now challenged testimony.  See *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005) ("Generally, an issue is not properly preserved if it is not raised before, and addressed and decided by, the trial court.").  However, consistent with previous holdings of this Court, we find that because the trial court considered and decided the issue, it is preserved for review.  See *Mills v White Castle Sys, Inc*, 199 Mich App 588, 591-592; 502 NW2d 331 (1992) ("We believe that the trial court had the opportunity to consider the issue and that it was sufficiently preserved for review.").

frequencies stop here. It just, it continues. But Penlink creates something you can see so it's something that you can understand. So, this tower definitely will pick up somebody that's on Basil using their cellular device.

The trial court immediately initiated a bench conference and thereafter excused the jury. The trial court stated that the off-record conference regarded "a concern the Court had because it sounded . . . like [Officer McDonald was] getting into somewhat of an expert opinion." The prosecutor stated that she would ask no further questions and would turn Officer McDonald over to defense counsel. Defense counsel asked that Officer McDonald's qualifications be examined in order to determine if he could be qualified as an expert witness.

During voir dire outside the presence of the jury, Officer McDonald testified that he had been analyzing cellular data for about four months and that he had been trained by retired Bureau of Alcohol, Tobacco, and Firearms Agent Stan Brue. However, Officer McDonald agreed that he did not have any "specialized training" and had not taken any classes or written any articles on cellular analysis. Officer McDonald had analyzed data from 70 phones using the Penlink program at the time of trial. He had conducted the analyses by himself, but indicated that Agent Brue "has to do a peer review." Officer McDonald had testified in two other cases, but he had never been qualified as an expert witness.

The prosecutor argued that Officer McDonald was an expert in "cellular phone analysis and tower location" but that his opinions about "tower locations" did not require expertise because the opinions were based on the call records and the map generated by the Penlink program. Defense counsel responded that Officer McDonald was "giving more than that, though." The trial court stated, "Well, he hasn't really given too much yet, so—." The prosecutor indicated that she understood the trial court's concern about Officer McDonald's testimony and reported that she did not plan to ask any technical questions. The trial court then stated as follows to defense counsel:

I'm certainly not gonna allow any more questions further with regards to the, how this works. And you'll certainly have ample time to cross-examine him. You can even ask him all the questions that we've already gone over. I am gonna limit that testimony. But go ahead.

Defense counsel responded:

[Officer McDonald] has already given testimony as to . . . the range extending beyond this pie chart area. And I believe he told the jury that . . . the signal goes much farther than that or could go farther than that which is located in, in this range. And I think that gets within the realm of someone who would have to qualify as an expert to get that sort of analysis or professional opinion.

So, it's a little bit more than just plugging some information into a computer and getting a readout and then just saying what the results were, your Honor.

The trial court ruled:

I'm gonna allow, obviously, extensive cross-examination on any issue. There's not gonna be any more questions that go into exactly how cell phone towers

work, how they operate. And I kind of su[a] sponte . . . was concerned that this was going into the area of an expert. I believe Stan Brue has been qualified previously as an expert . . . , at least in this court. So, but you certainly can ask many questions with regards to how this works, [defense counsel]. And we're gonna stop where [the prosecutor] indicated.

We fail to see how the trial court abused its discretion. Indeed, despite defense counsel's failure to object to Officer McDonald's testimony that the radio frequencies emitted by cell phones could travel outside of the sectors shown by the Penlink map, the trial court sua sponte initiated a bench conference to raise concerns that Officer McDonald was not qualified to provide such testimony. The trial court thereafter excused the jury and permitted voir dire of Officer McDonald concerning his qualifications. The trial court ultimately concluded that Officer McDonald could not offer opinions concerning "exactly how cell phone towers work."

Although Officer McDonald had already provided testimony that the radio frequencies emitted by cell phones could travel outside of the sectors shown by the Penlink map, the trial court invited defense counsel to resolve the issue by engaging in cross-examination. During cross-examination, defense counsel asked the following:

Officer McDonald, the, the item that's up on the screen, I just want to be clear, the address that you say was associated to Mr. Walker for the phone rather, would it be fair to say that that phone had to be used within that blue area?

The prosecutor then asked that counsel be permitted to approach the bench, and the trial court permitted counsel to approach. After a brief bench conference, the following occurred:

*Defense Counsel*: Officer McDonald, let me ask you this way. The phone that you said was associated with Mr. Walker, within this pie chart, what if anything is associated with that phone?

* * *

*Officer McDonald*: With this chart, Mr. Walker's cellular device is communicating with that cellular tower. That cellular tower is covering that sector, the blue. Like I explained earlier, just because (INAUDIBLE) pie doesn't mean that's where it stops.

So that's all I'm telling you. The cellular device was communicating with that cellular tower. That cellular tower is covering—It's not the tower itself. We have antennas on the towers. So, the antennas creates [sic] our sectors. If you ever noticed, you see some antennas have a bunch of rectangular shapes. Those are antennas. And then you see some that can have three or four. And it all depends on population.

So, the antennas that's [sic] on that tower is [sic] covering that sector. It's not the tower. It's the antennas that's [sic] on it that's covering that sector. They do not, radio frequencies do[] not stop within that pie. This is just (INAUDIBLE) within those three lines that you see, those three boundaries you see.

-5-

However, upon further cross-examination, Officer McDonald agreed that the data did not show which street the cell phone was located on when its operator made certain calls to the victim or the identity of the person who was using the phone. Therefore, Officer McDonald admitted that he could not say for certain that the operator was on Basil Street, or that Walker had made the calls to the victim's cell phone. Under these circumstances, we fail to see how the trial court abused its discretion. The trial court held that it was limiting Officer McDonald's testimony but that it would permit defense counsel to engage in "extensive cross-examination." The trial court permitted defense counsel to do so, at which point defense counsel elicited testimony that was similar to testimony already provided by Officer McDonald. Specifically, that the radio frequencies from cell phones can travel past the sectors depicted on the map. Even so, upon further examination, defense counsel was also able to elicit testimony that the data did not establish the exact location of the cell phone associated with Walker or who was operating the cell phone. We discern no abuse of discretion on the part of the trial court.

Furthermore, even if we were to conclude that the trial court abused its discretion by admitting the challenged evidence, the error would be harmless. "[A] preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999) (quotation marks omitted). "An error is 'outcome determinative if it undermined the reliability of the verdict'; in making this determination, this Court . . . 'focus[es] on the nature of the error in light of the weight and strength of the untainted evidence.'" *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010), quoting *People v Krueger*, 466 Mich 50, 54; 643 NW2d 223 (2002) (alteration added).

First, Officer McDonald did not, as Walker asserts on appeal, testify that Walker's phone was "definitely" in the area of the crime scene. Rather, Officer McDonald testified that the tower to which the cell phone was connected "definitely [would] pick up somebody that's on Basil using their cellular device." Officer McDonald expressly testified that he could not state for certain whether the cell phone associated with Walker was in any particular area or whether Walker was the person using the cell phone.

Furthermore, Officer McDonald's testimony was not necessary to establish Walker's identity as the perpetrator of the crimes. It is undisputed that an individual with a particular cell phone number told the victim to come to Basil Street to buy cell phones. The victim gave that phone number to the police, who associated the number with Walker through a database search. The police extracted text messages exchanged between the victim and the number associated with Walker from the victim's phone. The messages, which were read at trial, were consistent with the victim's testimony regarding the events leading up to the shooting. Importantly, the physical description that the victim provided was consistent with Walker's height and physical build at the time of his arrest. Two days after the crimes were committed, the police showed the victim a photographic lineup that included Walker, and the victim indicated that he was "100%" certain that Walker was the shooter. The victim testified at trial that Walker's face was visible throughout the shooting and robbery and that nothing was covering it. Additionally, certain aspects of the victim's testimony was corroborated by eyewitnesses. Although Walker implies that the testimony of the victim was not reliable, "[w]e do not interfere with the jury's assessment of the weight and credibility of witnesses or the evidence[.]" *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). Therefore, even if we were to conclude that the trial court abused its discretion,

Walker would not be entitled to a new trial because it is not more probable than not that admission of the evidence undermined the reliability of the verdict.

## B. EFFECTIVE ASSISTANCE OF COUNSEL

Walker argues that he received ineffective assistance of counsel during the plea bargaining process. Specifically, Walker contends that he rejected a plea offer solely on the basis of his defense counsel's unreasonable advice that he should wait until the day of trial for a better offer.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004) (quotation marks and citation omitted). "The trial court must first find the facts and then decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel. The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo." *Id*. (citation omitted). A finding is clearly erroneous if this Court is "left with a definite and firm conviction that the trial court made a mistake." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted).

To prevail on a claim of ineffective assistance of counsel, a defendant "must establish (1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000). This two-pronged test also applies to claims of ineffective assistance of counsel during the plea bargaining process. *Lafler v Cooper*, 566 US 156, 162-163; 132 S Ct 1376; 182 L Ed 2d 398 (2012). However, where a defendant alleges ineffective assistance relative to the rejection or acceptance of a plea offer, establishing the prejudice prong of the test requires the defendant to demonstrate that,

> but for the ineffective advice of counsel there is a reasonable probability . . . that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances[], that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. [*Id*. at 164.]

Accordingly, for Walker to succeed in his claim, he must initially establish that his defense counsel's performance was "below an objective standard of reasonableness under prevailing professional norms," *Sabin (On Second Remand)*, 242 Mich at 659, and that, but for this deficiency, he would have accepted the plea deal, *Lafler*, 566 US at 164. We agree with the trial court that Walker has not established either prong.

With regard to the performance prong, at a *Ginther*[2] hearing, Walker testified that he did not accept the prosecutor's second plea offer because defense counsel informed him that the prosecutor would make a better offer on the day of trial. Walker testified that he did not want to proceed to trial but ultimately rejected the plea offer at the October 12, 2018 hearing because defense counsel told him that he would likely receive an offer of seven years' imprisonment on the first day of trial.

Defense counsel testified that, after the prosecutor made the second plea offer, he told Walker that he would request a better plea offer. However, after the prosecutor indicated that a different offer would not be made, defense counsel relayed that information to Walker. According to defense counsel, Walker indicated that he wanted to go to trial. Defense counsel denied that he told Walker to reject the second plea offer because a better offer would arrive on the day of trial. Defense counsel believed that Walker wanted to go to trial and did not know that Walker was holding out for a better plea offer. Defense counsel testified that, in his 39 years of experience, he "may" have received a plea offer on the first day of trial two times. On both occasions, the offer was identical to a pretrial offer. The prosecutor testified that it was extremely rare for her to make plea offers on the first day of trial.

The trial court found defense counsel's testimony to be credible, finding that defense counsel did not advise Walker to reject the plea offer on the ground that the prosecutor would make a better offer on the day of trial. In light of this record, and giving due regard to the trial court's opportunity to assess the credibility of the witnesses who appeared before it, MCR 2.613(C), we cannot say that the trial court clearly erred by finding that defense counsel's performance did not fall "below an objective standard of reasonableness under prevailing professional norms," *Sabin (On Second Remand)*, 242 Mich App at 659.

Furthermore, with regard to the prejudice prong, we agree with the trial court that the record does not support Walker's contention that, but for defense counsel's alleged deficient performance, there is a reasonable probability that Walker would have accepted the plea offer. See *Lafler*, 566 US at 164. The record supports that Walker maintained his innocence and did not evidence an intent to accept any plea offer. Plea offers were discussed during several pretrial hearings, and there is no evidence that Walker ever communicated any inclination to accept them. Indeed, at two pretrial hearings, Walker expressly rejected the second plea offer and indicated that he wanted to go to trial. At sentencing, Walker maintained his innocence and did not mention the plea offers.

Furthermore, the record does not support that the trial court would have accepted pleas of guilt if Walker had accepted a plea offer. At the *Ginther* hearing, the trial court asked Walker if he was being truthful at the pretrial hearing when he said that he wanted to go to trial. Walker responded, "I can't say I was lying. But I would say that I was saying it because my lawyer told me that's the way that I would get a better plea." The trial court asked Walker if he was admitting that he was guilty, and Walker responded that he was not guilty but that he would have accepted a plea offer to reduce his sentence. The trial court stated:

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[Before] I take a plea, I always ask four questions. Has anyone promised you anything other than what's been stated on the record? Has anyone threatened you or forced you to plead guilty? Is it your own free choice to plead guilty? And the last question I always ask is: Are you pleading guilty because you are, in fact, guilty of what you're pleading to?

Walker stated that he would have answered the trial court's questions truthfully. The trial court found that, because Walker would have maintained his innocence, the court would have rejected Walker's guilty pleas.

In light of this evidence and, again, giving due regard to the trial court's credibility assessments, MCR 2.613(C), we conclude that Walker has not met his heavy burden of proving that defense counsel performed ineffectively. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009) ("Effective assistance of counsel is presumed and the defendant bears a heavy burden of proving otherwise.") (quotation marks and citation omitted). We therefore conclude that the trial court did not err in ruling that Walker received effective assistance of counsel.

## C. HABITUAL-OFFENDER ENHANCEMENT NOTICE

Walker argues that he is entitled to resentencing because the prosecution failed to comply with the requirements of the habitual-offender statute, MCL 769.13. We disagree that Walker is entitled to resentencing.

The issue of whether a defendant is entitled to resentencing because the prosecution did not comply with the habitual-offender notice requirements of MCL 769.13 is preserved for appellate review when the defendant raises the issue in the trial court. *People v Marshall*, 298 Mich App 607, 625-626; 830 NW2d 414 (2012), vacated in part on other grounds 493 Mich 1020 (2013). On appeal, Walker concedes that the issue was not raised in the trial court but argues that it is preserved because it was raised in his motion to remand. Although Walker is correct that this Court denied the portion of Walker's motion to remand that concerned this issue, *People v Walker*, unpublished order of the Court of Appeals, entered August 2, 2019 (Docket No. 346737), the authority Walker cites in support of his argument does not state that a challenge to the prosecution's failure to file a habitual-offender notice or proof of service may be preserved in a motion to remand, see *People v Kimble*, 470 Mich 305, 309-310; 684 NW2d 669 (2004). Therefore, the issue is not preserved for review.

This Court reviews unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

The plain language of MCL 769.13(2) explicitly requires the prosecution to file a habitual-offender notice with the trial court and to serve the notice upon the defendant. While the statute allows the notice to "be personally served upon the defendant or his or her attorney at the arraignment on the information," it also specifically states that "[t]he prosecuting attorney shall

file a written proof of service with the clerk of the court." MCL 769.13(2). The purpose of the notice requirement "is to provide the accused with notice, at an early stage in the proceedings, of the potential consequences should the accused be convicted of the underlying offense[s]." *People v Morales*, 240 Mich App 571, 582; 618 NW2d 10 (2000) (citation omitted).

Walker is correct that the prosecutor failed to file a habitual-offender notice and a written proof of service with the clerk of the court as required by MCL 769.13. Although we agree with Walker that this amounted to plain error, we conclude that it did not affect Walker's substantial rights because the record establishes that Walker received actual notice of the prosecution's intent to seek habitual-offender enhancement and that he suffered no prejudice by the lack of a written proof of service being filed in the trial court.[3]

The prosecutor filed the felony information and the felony complaint on June 16, 2018. The felony warrant was filed on June 17, 2018. All of these documents included the third-offense habitual-offender charge, and Walker has not alleged that he did not receive these documents. See *People v Head*, 323 Mich App 526, 544; 917 NW2d 752 (2018). Furthermore, when Walker was before the district court on June 27, 2018 and July 9, 2018, the district court began the proceedings by reading the charges against Walker and by noting that Walker had a "habitual offender, third offense notice." During several pretrial hearings in the trial court, plea offers were discussed on the record; the plea offers included the dismissal of the habitual-offense notice in exchange for Walker pleading guilty to several counts. Thus, the fact that the prosecution was seeking to enhance Walker's sentence as a third-offense habitual offender was announced on the record at several pretrial proceedings. See *id.* at 545. At sentencing, neither defense counsel nor Walker objected to the enhancement. See *id.* Notably, Walker does not challenge the substantive basis for his third-offense habitual-offender status on appeal. See *id.*

Thus, the record establishes that Walker received actual notice of the prosecution's intent to seek an enhanced sentence and that he had the opportunity to respond to the habitual-offender enhancement. Consequently, Walker cannot establish that his substantial rights were affected by the prosecution failing to comply with MCL 769.13.

Walker also argues in a cursory manner that defense counsel was ineffective for failing to object to the prosecution's failure to comply with MCL 769.13 prior to sentencing. However, because Walker's substantial rights were not affected for the reasons already explained, we conclude that Walker cannot establish that the outcome of the proceedings would have been different but for counsel's failure to object. See *Sabin (On Second Remand)*, 242 Mich App at 659.

---

[3] We note that Walker relies on *People v Straughter*, unpublished per curiam opinion of the Court of Appeals, issued April 11, 2017 (Docket No. 328956), which is not binding. See MCR 7.215(C)(1). Additionally, the Supreme Court denied leave to appeal after hearing oral arguments. *People v Straughter*, 504 Mich 930; 930 NW2d 384 (2019).

## D. COURT COSTS

Walker argues that the trial court imposed an unconstitutional tax when it assessed $1,300 in court costs under MCL 769.1k(1)(b)(*iii*). Challenges to the imposition of fees and court costs under MCL 769.1k that are not based on a defendant's indigency or the applicability of the statute must be made at the trial court level to be preserved. *People v Jackson*, 483 Mich 271, 292 n 18; 769 NW2d 630 (2009). Walker did not challenge the constitutionality of the trial court's assessment of court costs against him at the trial court level. Consequently, the issue is unpreserved, and we will review the unpreserved claim for plain error affecting substantial rights. *Carines*, 460 Mich at 763.

On appeal, Walker challenges the imposition of the court costs on various constitutional grounds. However, Walker acknowledges that, in *People v Cameron*, 319 Mich App 215, 236; 900 NW2d 658 (2017), this Court considered and rejected the arguments that he raises on appeal. While the *Cameron* Court agreed that MCL 769.1k(1)(b)(*iii*) imposes a tax rather than a fee, the Court found that the tax imposed did not violate the "Distinct Statement Clause of Michigan's Constitution," Const 1963, art 4, § 32, or "the separation-of-powers provision of Const 1963, art 3 § 2." *Cameron*, 319 Mich App at 236. Walker acknowledges that *Cameron* is controlling precedent that binds us, but argues that *Cameron* was wrongfully decided. Because we are bound by this Court's decision in *Cameron*, Walker has failed to establish that the imposition of costs under MCL 769.1k in this case constituted plain error.[4] See MCR 7.215(J)(1).

Affirmed.

/s/ Kathleen Jansen
/s/ Kirsten Frank Kelly
/s/ Thomas C. Cameron

---

[4] Walker notes that the Supreme Court granted oral argument to consider whether to grant an application for leave to appeal in *Cameron*. See *People v Cameron*, 501 Mich 986; 907 NW2d 604 (2018). However, the Supreme Court later denied the application for leave to appeal after holding oral arguments. *People v Cameron*, 504 Mich 927; 929 NW2d 785 (2019). Therefore, this Court's holding in *Cameron*, 319 Mich App at 236, remains binding precedent.