*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CHRISTOPHER MICHAEL CHEATHAM,

Defendant-Appellant.

UNPUBLISHED
July 13, 2023

No. 360345
Washtenaw Circuit Court
LC No. 19-000975-FC

Before: PATEL, P.J., AND BOONSTRA AND RICK, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of second-degree murder, MCL 750.317; receiving and concealing stolen property valued less than $200, MCL 750.535(5); and two counts of stealing or retaining a financial transaction device without consent, MCL 750.157n(1). The trial court sentenced defendant to concurrent prison terms of 18 to 40 years for second-degree murder, 93 days for receiving and concealing stolen property valued less than $200, and 365 days for each count of stealing or retaining a financial transaction device without consent. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant rented a room on the second floor of a tri-level home from Richard Fortune, who also lived in the basement of the home. Due to a medical condition, Fortune lived with an implanted defibrillator pacemaker. On February 20, 2019, a nurse practitioner at the University of Michigan Cardiovascular Center, Laura Horwood, who was remotely monitoring Fortune's pacemaker data, received a concerning pacemaker alert and called 911 to request a welfare check. Responders found Fortune deceased at approximately 5:30 p.m. on that date. Fortune had been strangled and his body tied up with rope, wrapped in a tarp, and placed under a mound of blankets in the basement of the home.

Before trial, defendant moved to exclude testimony or evidence regarding the use of pacemaker data to determine Fortune's time of death. Defendant argued that the use of pacemaker data as a scientific tool to determine time of death had not been scientifically proven to be reliable.

-1-

The prosecution responded, arguing that the pacemaker data was reliably used in conjunction with the medical examiner's body decomposition analysis to determine the time of death.

The trial court held a *Daubert*[1] hearing on defendant's motion. The prosecution offered Nathan Munsterman as an expert in pacemakers and defibrillators. Munsterman had worked for Medtronic for over 22 years and was, at the time, a technical services systems consultant who answered questions from clinicians, representatives, and nurses regarding device operations. He had received a bachelor's degree in biomedical engineering and a master's degree in technology management. He was involved with the design and development of pacemakers and defibrillators. He had served as an expert witness in pacemakers and defibrillators in two out-of-state cases. He was trained in pacemakers and defibrillators in school and at work. He did not commonly receive calls from medical examiners, but had received five to seven such calls over the preceding seven years. Munsterman had never published an article about estimating the time of death on the basis of interpreting pacemaker data. He was aware of two studies focused on the interpretation of pacemaker data to determine time of death. He knew of one occurrence when the pacemaker data falsely indicated, as a result of a dislodged lead,[2] an individual's death. The trial court qualified Munsterman as an expert witness.

During the hearing, Munsterman opined, based on the data from Fortune's pacemaker, that Fortune had died between 8:24 p.m. on February 19 and 12:24 a.m. on February 20.[3] According to Munsterman, Fortune's pacemaker historically "paced" (i.e., sent electrical signals to the heart to make it beat) an average of 4.2% of the day. However, the data showed that Fortune's pacing increased from 5% on February 18 to 16% on February 19.

Munsterman explained that an impedance value measured the resistance to the current flow from the pacemaker. On February 19, at 8:24 p.m., Fortune's impedance value was normal and consistent with prior measurements. On February 20, at 2:24 a.m., Fortune's impedance value was high, which suggested that something was wrong either with the lead or with Fortune. Munsterman explained that the lead could have been fractured, dislodged, or broken. Munsterman further explained that the impedance value could have been affected by Fortune's condition or activity, such as if he was wet or dry, or if he engaged in a physical altercation that shifted the pacemaker. If something impacted the lead, then the estimated time of death for Fortune would have consequently been impacted. The data leading up to the impedance measurement did not indicate that anything was wrong with the lead, but Munsterman could not opine as to whether something was wrong with the lead without conducting a destructive analysis on the pacemaker.

Munsterman also testified that other measurements transmitted from Fortune's pacemaker were atypical. On February 20, at 12:24 a.m., the pacemaker measured a high ventricular threshold, which meant that the pacemaker had paced "really hard" but did not receive a response from the heart. On February 20, at 2:15 a.m., the pacemaker was unable to measure any heart

---

[1] *Daubert v Merrell Dow Pharms, Inc*, 509 US 579, 592; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[2] Leads are wires that deliver bursts of electrical energy to the heart.

[3] Later testimony taken at trial established that defendant was at home during this time.

waves. On February 20, at 2:24 p.m., the pacemaker sent an alert to the University of Michigan and Medtronic; the accompanying electrogram showed no evidence of cardiac activity.

The trial court denied defendant's motion to exclude testimony and evidence regarding the use of pacemaker data to determine Fortune's time of death. The trial court did not find the interpretation of the pacemaker data "particularly outrageous or a stretch in terms of the conclusions." The trial court determined that defendant's criticisms went to the weight, rather than the admissibility, of the testimony and evidence provided by Munsterman.

During a six-day trial, various witnesses testified about defendant's relationship with Fortune, as well as defendant's and Fortune's whereabouts on the day of, and the day following, Fortune's death. Peresto Burks, who also rented a room on the second floor of the house, testified that he had, in the past, observed defendant and Fortune arguing about rent. Burks testified that he was at work as a dishwasher at a restaurant from approximately 4:00 p.m. to midnight on February 19, that he saw defendant at some point "after midnight," and that he later heard someone he presumed to be Fortune moving around downstairs, although he did not see who it was. Burks testified that he did not recall seeing Fortune or defendant the following morning. Burks also testified that he had to leave for work at 3:30 p.m. on February 19th in order to start his shift at 4:00 p.m., and that he usually stopped at a store after work to purchase beer. Testimony was also provided regarding the receipt of the pacemaker data that led to the discovery of Fortune's body. Munsterman testified, relating testimony in keeping with that provided at the evidentiary hearing. Horwood testified that, in 2019, she was employed to review home monitoring transmissions from various pacemaker patients, including Fortune. She testified that Fortune's pacemaker sent an "alert transmission" at approximately 3:00 p.m. on February 20.[4] She testified that the alert was for "elevated shock impedance" and was "consistent with somebody who is deceased." Horwood agreed that the alert transmission did not tell her when Fortune's heart had stopped. She testified that based on her review of the alert transmission, she instructed a colleague to ask the police to perform a welfare check on Fortune.

Dr. Allecia Wilson, the forensic pathologist who performed the autopsy on Fortune's body, testified that Fortune's cause of death was strangulation, and that she had determined that the pacemaker was properly placed. She testified that the results of her autopsy were not inconsistent with the report from the pacemaker indicating that Fortune's heart was not beating at 12:24 a.m. on February 20. Dr. Wilson admitted on cross-examination that she had, at some point before trial, preliminary estimated that Fortune's death could have occurred 6 to 12 hours before Fortune was pronounced dead, which would have meant that Fortune died on February 20, between 5:30 a.m. and 11:30 a.m. However, Dr. Wilson clarified that at that point she had "not reviewed everything" and that her primary focus had been "the cause and manner of death." She testified that after a more thorough review, she determined that Fortune had died earlier. In addition to the pacemaker data, Dr. Wilson noted that a death investigator had noted the absence of rigor mortis when she arrived on the scene to examine Fortune's body.

---

[4] Munsterman testified that this report was sent at 2:24 p.m.

Police witnesses testified that two cellular phones belonging to Fortune were found in defendant's room, as well as two credit cards belonging to Fortune. Gloves were also found in defendant's room. Fibers matching the fabric of those gloves were found on the ropes tying Fortune's body. Defendant's DNA, but not Burks's, was also found on the ropes. A police witness also testified that records from a rideshare app indicated that defendant was dropped off at home on the night of February 19 at 10:38 p.m. Burks's former manager testified that he clocked in at work at 3:38 p.m. and left at 11:56 p.m. on February 19.

Defendant presented witness testimony that he was at work on February 20, 2019 from approximately 11 a.m. to 5:30 p.m.

Defendant was convicted and sentenced as described. This appeal followed.

## II. ADMISSION OF EXPERT TESTIMONY

Defendant argues that the trial court abused its discretion by admitting expert testimony that did not meet the requirements of MRE 702. Specifically, defendant argues that Munsterman's expert testimony was the product of an unreliable scientific method and provided by an expert who did not reliably analyze the facts and data. We disagree.

This Court reviews de novo preliminary questions of law, such as whether a rule of evidence or statute precludes the admissibility of evidence. See *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). We review for an abuse of discretion a trial court's decision to either admit or exclude evidence. *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *People v Carnicom*, 272 Mich App 614, 617; 727 NW2d 399 (2006).

A trial court is obligated "to exercise [its] discretion as a gatekeeper and ensure that any expert testimony admitted at trial is reliable." *People v Yost*, 278 Mich App 341, 394; 749 NW2d 753 (2008). A trial court must determine at the outset "whether [an] expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue," *Daubert v Merrell Dow Pharms, Inc*, 509 US 579, 592; 113 S Ct 2786; 125 L Ed 2d 469 (1993), because a trial court "has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable," *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012).

A trial court's certification of experts and admission of expert testimony is governed by MRE 702:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 incorporates the standards of reliability that the United States Supreme Court established in *Daubert*. *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). "MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from [the] data." *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007) (quotation marks and citation omitted). Under MRE 702, expert testimony must not only be viewed as legitimately within the witness's field of expertise, but the field of expertise itself must also be based upon the "methods and procedures of science." *Unger*, 278 Mich App at 217. A party offering expert testimony bears the burden of establishing that the expert testimony is reliable by "satisfying the preconditions established by MRE 702." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781, 789; 685 NW2d 391 (2004).

A trial court must determine that an expert's opinion is based upon reliable principles and methodology rather than "unsupported speculation." *Daubert*, 509 US at 590. However, "a trial court's role as gatekeeper does not require [the trial court] to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Unger*, 278 Mich App at 217 (quotation marks and citation omitted). Moreover, a trial court's "inquiry is not into whether an expert's opinion is necessarily correct or universally accepted" but rather "[t]he inquiry is into whether the opinion is rationally derived from a sound foundation." *Id*. (quotation marks and citation omitted). Under *Daubert*, 509 US at 589-590, "[t]he standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony." A trial court should consider certain factors when evaluating the reliability of a scientific theory or technique, including, but not limited to: (1) whether the scientific knowledge or technique can and has been tested; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether there is "general acceptance" of the scientific technique. *Id*. at 593-597. These factors may or may not be relevant in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of the expert's testimony, so it is within a trial court's discretion how to determine reliability. *Kumho Tire Co v Carmichael*, 526 US 137, 150, 152; 119 S Ct 1167; 143 L Ed 2d 238 (1999).

In this case, defendant argues that Munsterman's expert testimony was the product of an unreliable scientific method. Specifically, defendant contends that the expert testimony did not satisfy the reliability standard set forth in MRE 702 and, by extension, *Daubert*. We disagree. The testimony provided by Munsterman about the use of pacemaker data to estimate a time of death satisfied the reliability standard set forth in MRE 702 and *Daubert*.

Munsterman confirmed that clinical studies analyzed and interpreted measurements and data captured by pacemakers. Munsterman's own analysis and interpretation of pacemaker data were reviewed by colleagues. Munsterman shared an occurrence when pacemaker data indicated that a patient was dead, but the patient was later discovered to be alive. Accordingly, there were facts in the record to support a finding that the interpretation of pacemaker data can and has been tested.

Further, Munsterman testified that the practice of interpreting pacemaker data has been peer reviewed and the subject of published studies. Munsterman knew of two published studies, one of which he referred to in his report. Munsterman explained that that study reviewed abrupt

increases in impedance values relative to a patient's time of death. Accordingly, there were also facts in the record to support a finding that the interpretation of pacemaker data has been peer reviewed and published.

With regard to an error rate, Munsterman testified regarding a known or potential error rate concerning the interpretation of pacemaker data. Munsterman stated that the interpretation of false or bad pacemaker data occurred in one out of one hundred times. With regard to controlling standards, Munsterman testified that the interpretation of pacemaker data involved reviewing the data that the pacemaker transmitted, observing trends or measurements, and reporting on what the data revealed. Munsterman admitted that conclusions stemming from the interpretation of pacemaker data could be misleading if there were mechanical failures or complications with the pacemaker itself. Munsterman explained that if the data did not indicate the existence of a mechanical failure, then a destructive analysis on the pacemaker would reveal any mechanical failure. Munsterman confirmed that the pacemaker data was reviewed the same way every time. Accordingly, there were facts in the record to support a finding that there was a known or potential error rate, and standards controlling the interpretation of pacemaker data.

Munsterman also testified that the interpretation of pacemaker data was not a new or experimental science. The trial court noted that the medical community has used pacemakers for medical purposes for decades and relied on pacemakers to reliably function as designed. Accordingly, there were facts in the record to support a finding that the interpretation of pacemaker data is a generally-accepted technique.

When considered in whole, the evidence provided to the trial court was sufficient to establish that the interpretation of pacemaker data was a reliably scientific technique. *Daubert*, 509 US at 590. The trial court properly focused on the scientific validity of the methods employed rather than on the credibility or soundness of the conclusions. As the trial court properly recognized, the testimony provided was not "particularly outrageous or a stretch in terms of the conclusions" and "was based on the feedback that [came] from the pacemaker." The danger that the pacemaker data may have been faulty, as suggested by defendant, did not go to the reliability of the interpretation itself but to the reliability of the conclusions. The trial court did not abuse its discretion by admitting Munsterman's expert testimony about an estimated time of death because the estimate was premised on a reliable scientific technique. *Yost*, 278 Mich App at 394.

Defendant also argues that the challenged expert testimony was provided by an expert who did not reliably analyze the facts and data. We disagree. Munsterman possessed the necessary knowledge, skills, and experience to testify as an expert on pacemakers. He had worked at Medtronic for over 22 years, dedicated in part to answering questions from clinicians, representatives, and nurses about device operations. He had received a bachelor's degree in biomedical engineering and a master's degree in technology management. He was well-versed in the mechanics of pacemakers because of his involvement in the design and development of pacemakers. He had learned about pacemakers in school and at work. Additionally, Munsterman was familiar with the specific pacemaker implanted in Fortune. He was familiar with data trends transmitted by the pacemaker, which were supported by testimony from a number of people who knew Fortune. He explained how he interpreted the pacemaker data and what each measurement or value suggested for Fortune. Accordingly, the trial court did not abuse its discretion by

admitting the expert testimony because the testimony was provided by an expert who reliably analyzed the facts and data. *Yost*, 278 Mich App at 394.

## III. STANDARD 4 BRIEF

In his Standard 4 brief,[5] defendant argues that his trial counsel was ineffective in (1) failing to secure defense expert witnesses to counter the testimony of the prosecution's expert witnesses, (2) failing to have a witness testify, and (3) failing to "move to strike" Horwood's testimony. Defendant also argues that the trial court erred by allowing Horwood's testimony. We conclude that none of defendant's arguments have merit.

A defendant's claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review a trial court's findings of fact for clear error, and we review de novo questions of constitutional law. *Id.* Because a *Ginther*[6] hearing was not held, our review of the relevant facts is limited to mistakes apparent on the record. *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

The Sixth Amendment of the United States Constitution guarantees defendants the right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Michigan's Constitution affords the same right. *People v Pickens*, 446 Mich 298, 318-320; 521 NW2d 797 (1994). When a defendant claims that he was denied the effective assistance of counsel, the defendant must "show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *Riley*, 468 Mich at 140. To prove counsel's performance was deficient, the defendant must show that "counsel's performance was below an objective standard of reasonableness." *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). To prove that counsel's deficient performance prejudiced the defense, the defendant must show "a reasonable probability that the outcome of the proceeding would have been different but for trial counsel's errors." *Id.*

Counsel's performance is presumed to be the product of sound trial strategy, and a defendant must overcome that strong presumption. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *Id.* at 76-77. However, a reviewing court "must determine whether the 'strategic choices [were] made after less than complete investigation,' or if a 'reasonable decision [made] particular investigations unnecessary.' " *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015), quoting *Strickland*,

---

[5] A pro se supplemental appellate brief by a criminal defendant filed under Supreme Court Administrative Order No. 2004-6, Standard 4.

[6] *People v Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973).

466 US at 690-691 (alterations in *Ackley*). "A trial strategy is not ineffective simply because it ultimately does not succeed." *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020).

## A. LACK OF DEFENSE EXPERT WITNESSES

Defendant argues that his trial counsel was ineffective in failing to obtain expert witnesses to either help counsel better cross-examine the prosecution's witnesses or testify on his behalf. Defendant does not identify any specific experts whom he believes should have been consulted or called as a witness, and does not identify the substance of any testimony that could have been provided. Accordingly, he has failed to establish the factual predicate for his claim of ineffective assistance. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Further, the record shows that defendant's counsel conducted a thorough and capable cross-examination of the prosecution's expert witnesses and pointed out weaknesses in their testimony, such as the fact that Munsterman testified that only a destructive analysis of Fortune's pacemaker (which was not done in this case) could completely verify the accuracy of its transmissions, the fact that the fiber analysis appeared to have been only partially completed, the lack of DNA testing of certain items, and other potential sources of reasonable doubt. Defendant has not established that his counsel's performance was deficient. *Ackerman*, 257 Mich App at 455.

## B. FAILURE TO CALL WITNESS

Defendant also argues that his counsel was ineffective in failing to call a witness to testify that she had seen Burks have altercations with Fortune before his death and that, after Fortune's death, she had heard Burks make statements implying that he had killed someone. We disagree. Defendant does identify the alleged potential witness, who was interviewed by the police. He states in his brief that he informed his counsel of her existence and, according to defendant, his counsel stated that the witness was not credible and was "a hot mess." In other words, according to defendant himself, his attorney investigated the potential witness and opted, as a matter of trial strategy, not to have her testify. We will not assess this decision with the benefit of hindsight. *Rockey*, 237 Mich App at 76. In any event, the witness's testimony would not have addressed the fact that, if the jury were convinced of the prosecution's theory of the time of death, there would have been an extremely short interval between the time Burks clocked out of work and the time Fortune's pacemaker sent an alert, in which Burks might have traveled home, killed Fortune, and hid his body. Defendant has not demonstrated a reasonable probability that the lack of this witness's testimony was outcome-determinative. *Ackerman*, 257 Mich App at 455.

## C. HORWOOD'S TESTIMONY

Defendant also argues that the trial court erred by admitting, and his counsel erred by failing to move to strike, Horwood's testimony, which was based on a report that had not been provided to the defense. We disagree. Regarding his counsel's alleged ineffectiveness, we note that defendant's counsel did raise an objection concerning Horwood's testimony regarding a report that had not been given to the defense. Although the attorneys and the trial court resolved the issue off the record, defendant's counsel was not required to repeat an objection once the trial court had ruled on it. *Ackerman*, 257 Mich App at 455. Regarding the trial court's decision to admit Horwood's testimony, it appears from the record that Horwood testified that, in 2019, she reviewed the report generated by Fortune's pacemaker alert, and that it was on the basis of information from

that report that she subsequently called the police to perform a welfare check. In other words, Horwood testified to her memory of what she had learned from the 2019 report; she did not offer the report itself into evidence or read from it. In any event, Horwood admitted that she could not determine the time of Fortune's death, only that she believed he was dead at the time the pacemaker sent its report on the afternoon of February 20. Defendant also has not established that the trial court's decision to admit this testimony, even if erroneous, was prejudicial. See *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014) (stating that a preserved evidentiary error "is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict") (quotation marks and citations omitted).

## IV. CONCLUSION

We conclude that the trial court did not abuse its discretion by admitting expert testimony concerning Fortune's pacemaker and his estimated time of death, because the estimate was premised on a reliable scientific technique and provided by an expert who reliably analyzed the facts and data. We further conclude that defendant's counsel was not ineffective, and that the trial court did not commit reversible error by admitting Horwood's testimony.

Affirmed.

/s/ Sima G. Patel
/s/ Mark T. Boonstra
/s/ Michelle M. Rick